1   Peter Anderson, Esq. (Cal. Bar No. 88891)
        peteranderson@dwt.com
2   Sean M. Sullivan, Esq. (Cal. Bar No. 229104)
        seansullivan@dwt.com
3   Eric H. Lamm, Esq. (Cal. Bar No. 324153)
        ericlamm@dwt.com
4   DAVIS WRIGHT TREMAINE LLP
    865 South Figueroa Street, 24th Floor
5   Los Angeles, California  90017-2566
    Telephone: (213) 633-6800
6   Fax: (213) 633-6899

7   Attorneys for Defendants

8   J. Douglas Baldridge, Esq.
        jbaldridge@venable.com
9   Katherine Wright Morrone, Esq.
        kwmorrone@venable.com
10  VENABLE LLP
    600 Massachusetts Avenue NW
11  Washington, DC 20001
    Telephone: (202) 344-4000
12  Fax: (202) 344-8300

13  Attorney for Defendant
    TAYLOR SWIFT

14

15                  **UNITED STATES DISTRICT COURT**

16                **CENTRAL DISTRICT OF CALIFORNIA**

17                      **WESTERN DIVISION**

18  SEAN HALL, *etc., et al.*,          ) Case No. 2:17−cv−06882 MWF (ASx)
                                        )
19             Plaintiffs,              )
                                        )
20      vs.                             ) DEFENDANTS' MEMORANDUM OF
                                        ) POINTS AND AUTHORITIES IN
21  TAYLOR SWIFT, *etc., et al.*,       ) SUPPORT OF SECOND MOTION FOR
                                        ) SUMMARY JUDGMENT
22             Defendants.              )
                                        )
23  _____   ) Date: September 19, 2022
                                        ) Time: 10:00 a.m.
24

25                                      Courtroom of the Honorable
                                        Michael W. Fitzgerald
26                                      United States District Judge

27

28

# **TABLE OF CONTENTS**

**Page**

1. INTRODUCTION .............................................................................................. 1

    (a)   Summary of Argument ......................................................................... 1

    (b)   Summary of Uncontroverted Facts...................................................... 3

           (1)   Plaintiffs Co-Author the *Playas* Musical Composition ............... 3

           (2)   Plaintiffs Assign to Their Music Publishers Their Rights to Sue for Infringement and the Claim They Assert in this Case .... 3

           (3)   *Playas* Is Recorded by 3LW and Released as a Single in 2001 ............................................................................................. 4

           (4)   Before *Shake It Off*, the Allegedly Copied Player and Hater Phrases Were Already Prevalent in Pop Culture and Music ....... 4

           (5)   In 2014, Taylor Swift, Max Martin, and Shellback Create *Shake It Off*.............................................................................. 4

           (6)   Plaintiffs File this Infringement Action on Narrow Grounds ...... 6

           (7)   Plaintiffs Ask Their Music Publishers to Assign the Alleged Claim to Them, But Their Music Publishers Decline................. 6

    (c)   Procedural Posture.............................................................................. 7

2. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED ............................................................................................ 8

    (a)   The Standards Applicable to this Motion............................................ 8

    (b)   Plaintiffs Do Not Own the Claim They Assert in this Action................ 8

           (1)   Authors May Assign the Right to Sue for Copyright Infringement .............................................................................. 8

           (2)   Mr. Hall Assigned to Famous Music All of His Rights to Sue for Infringement of the *Playas* Copyright............................ 9

           (3)   Mr. Butler Also Assigned to His Music Publisher All of His Rights to Sue for Infringement of the *Playas* Copyright .......... 11

i

(c)   The Evidence Does Not Raise a Genuine Dispute as to Copying ....... 13

(1)   *Playas* and *Shake It Off* Are Not Strikingly Similar ................. 13

(2)   The *Shake It Off* Songwriters Did Not Have Access to *Playas* .................................................................................. 14

(i)   No Chain of Events Supports Access ............................. 15

ii.   Plaintiffs' Theory of Access through Wide Dissemination Also Fails ................................. 15

(d)   Plaintiffs Also Cannot Avoid the Fair Use Doctrine ......................... 17

(1)   The Purpose and Character of the Use ..................................... 18

(i)   *Shake It Off's* Use of Player and Hater Phrases Is Transformative ................................................. 18

(ii)   *Shake It Off's* Use Is Not Primarily Commercial ........... 20

(2)   The Nature of Plaintiffs' Copyrighted Work ........................... 21

(3)   The Amount and Substantiality of the Portion Used ................ 21

(4)   The Effect on the Market for or Value of Plaintiffs' Work ....... 23

3.   CONCLUSION .................................................................................. 24

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    944 F.2d 971 (2d Cir. 1991)................................................................. 9, 16

*Acuff–Rose Music, Inc. v. Jostens, Inc.*,
    988 F. Supp. 289 (S.D.N.Y. 1997), *aff'd*,
    155 F.3d 140 (2d Cir. 1998).................................................................. 16

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) .................................................................................. 8

*Art Attacks Ink, LLC v. MGA Entm't, Inc.*,
    581 F.3d 1138 (9th Cir. 2009) ............................................................... 14

*Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*,
    803 F.3d 1032 (9th Cir. 2015) ................................................................. 1

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)............................................................. 21, 24

*Blanch v. Koons*,
    467 F.3d 244 (2d Cir. 2006)................................................................... 24

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)................................................. 18, 19, 20, 21, 23

*Cariou v. Prince*,
    714 F.3d 694 (2d Cir. 2013).................................................... 18, 19, 20

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .................................................................................. 8

*Dr. Suess Enterps., L.P. v. ComicMix LLC*,
    983 F.3d 443 (9th Cir. 2020) ................................................................. 20

*F.T.C. v. Stefanchik*,
    559 F.3d 924 (9th Cir. 2009) ................................................................... 8

*Fisher v. Dees*,
    794 F.2d 432 (9th Cir. 1986) ................................................................. 22

*Hall v. Swift*,
    786 F. App'x 711 (9th Cir. 2019) ........................................................... 7

*Hill v. Walmart Inc.*,
    32 F.4th 811 (9th Cir. 2022) ................................................................. 8

*Intersong-USA v. CBS, Inc.*,
    757 F. Supp. 274 (S.D.N.Y. 1991) ...................................................... 16

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ......................................................... 21, 23

*Leibovitz v. Paramount Pictures Corp.*,
    137 F.3d 109 (2d Cir. 1998) ................................................................ 23

*Lennon v. Premise Media Corp.*,
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) ................................................. 23

*Loomis v. Cornish*,
    836 F.3d 991 (9th Cir. 2016) .................................................. 14, 15, 16

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
    922 F.3d 946 (9th Cir. 2019) .............................................................. 13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) .............................................................................. 8

*McRae v. Smith*,
    968 F. Supp. 559 (D. Co. 1997) .......................................................... 16

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
    795 F.3d 997 (9th Cir. 2015) ................................................................ 9

*Red Label Music Pub., Inc. v. Chila Prods.*,
    388 F. Supp. 3d 975 (N.D. Ill. 2019) .................................................. 23

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018), *overruled on other grounds by*
    *Skidmore v. Led Zeppellin*, 952 F.3d 1051 (9th Cir. 2022) ................. 14

*Righthaven LLC v. Hoehn*,
    716 F.3d 1166 (9th Cir. 2013) ............................................................ 13

*Seltzer v. Green Day, Inc.*,
    725 F.3d 1170 (9th Cir. 2013) ............................... 18, 19, 20, 21, 22, 24

iv

*Selznick v. Turner Ent. Co.*,
  990 F. Supp. 1180 (C.D. Cal. 1997) ..................... 10

*Silvers v. Sony Pictures Entm't, Inc.*,
  402 F.3d 881 (9th Cir. 2005) ......................... 9

*Skidmore v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) ................. 13, 14, 15

*SOFA Entm't v. Dodger Prods, Inc.*,
  709 F.3d 1273 (9th Cir. 2013) ................. 21, 22, 23

*Stabile v. Paul Ltd.*,
  137 F. Supp. 3d 1173 (C.D. Cal. 2015) .......... 13, 14

*Stewart v. West*, No. CV 13-02449,
  2014 WL 12591933 (C.D. Cal. Aug. 14, 2014) ................ 22

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477 (9th Cir. 2000), *overruled on other grounds by*
  *Skidmore v. Led Zeppelin*, 952 F.3d 1051 (9th Cir. 2020) ................. 15

*Threshold Media Corp. v. Relativity Media, LLC*, No. CV 10-09318,
  2013 WL 12331550 (C.D. Cal., Mar. 19, 2013)............ 22, 23

*Warren v. Fox Family Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) ................. 9, 11, 13

**Statutes**

17 U.S.C.
  § 102............................................................ 1
  § 107............................................................ 24
  § 107(1)..................................................... 18, 20
  § 107(1)-(4)................................................ 18
  § 107(3)..................................................... 21, 23
  § 201(a)..................................................... 9
  § 201(d)..................................................... 9
  § 501......................................................... 9
  § 501(b)..................................................... 9

**Rules**

Federal Rules of Civil Procedure

Rule 1 ......................................................................................... 8
Rule 56 ....................................................................................... 8

**Constitutional Provisions**

United States Constitution

Article I, § 8, cl. 8 ................................................................... 24

**Other Authorities**

2 M. Nimmer & D. Nimmer, NIMMER ON COPYRIGHT (2022)

§ 8.01[A] (2022) ....................................................................... 13
§ 13D.07[A] ............................................................................. 13

Pierre Leval, *Toward a Fair Use Standard*,

103 HARV. L. REV. 1105, 1111 (1990) ................................... 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## 1.   INTRODUCTION

### (a)   Summary of Argument

It is, unfortunately, not unusual for a hit song to be met by litigants hoping for a windfall based on tenuous claims that their own song was copied.  But even against that background, Plaintiffs' claim sticks out as particularly baseless.  Ostensibly suing for *Shake It Off*'s alleged copying of a musical composition, *Playas Gon' Play* ("*Playas*"), Plaintiffs admit that no music was copied.  Instead, they claim that both songs combine the commonplace phrases players gonna play and haters gonna hate— phrases *Plaintiffs admit* are public domain and free for everyone to use—and include two other phrases that *Plaintiffs admit* are different in *Playas* and *Shake It Off*.

Accordingly, last year Defendants filed an early Motion for Summary Judgment under the extrinsic test, which requires substantial similarity in concrete, protected expression, not ideas or public domain elements.  Defendants raised, for example, that, as a matter of law, Plaintiffs' claimed selection and arrangement is not infringed by allegedly copying two public domain phrases and *the idea* of adding two more but different phrases.[1]  The Court, although observing that Defendants made a strong showing, declined to grant summary judgment.  Dec. 9, 2021, Order (Doc. 104).  Defendants timely moved the Court to amend or reconsider its ruling.  That Motion was fully briefed and taken under submission by the Court, and remains pending.  *See* Dkt. Entry 114.

In the meantime, the parties have completed fact discovery, which has confirmed that Plaintiffs' copyright infringement claim has multiple additional and ///

---

[1]   *See, e.g., Bikram's Yoga Coll. of India, L.P. v. Evolation Yoga, LLC*, 803 F.3d 1032, 1041 (9th Cir. 2015) ("[17 U.S.C.] Section 102's categorical bar on copyright protection for ideas" prohibits a selection-and-arrangement claim based on the alleged copying of selected-and-arranged ideas.); Defs' Reply (Doc. 113) at 17-25.

1

fatal flaws.  Accordingly, Defendants now file their Second Motion for Summary Judgment, raising the following.[2]

First, Plaintiffs lack standing to bring this action because it is undisputed that they each entered into music publishing agreements in which they conveyed to their music publishers the exclusive rights to sue for the claimed infringement of the *Playas* copyright, including the very claim they assert in this case.  In fact, Plaintiffs also have admitted that they asked their music publishers to transfer the claim back to them, but the music publishers declined.  Any and all rights Plaintiffs had to bring the claim they assert here—whether as legal or beneficial owners or under any other standing theory they may argue—belong to their music publishers, not them.  *See below* at 8-13.

Second, the evidence is undisputed that the creators of *Shake It Off*—Taylor Swift, Karl Martin Sandberg, and Karl Johan Schuster—did not copy from *Playas* the idea of combining the public domain phrases players gonna play and haters gonna hate.  Indeed, Plaintiffs concede that the phrases were part of popular culture long before *Shake It Off*'s creation in 2014.  Plaintiffs also concede the two songs are not strikingly similar and that Plaintiffs never provided *Playas* to *Shake It Off*'s songwriters.  Instead, Plaintiffs argue that *Playas* was widely disseminated in the United States in 2001.  But in 2001 two of the three *Shake It Off* songwriters lived in Sweden and the third was only eleven years old and living in Wyomissing, Pennsylvania, where *Playas* had almost no radio airplay.  *See below* at 13-17.

Third, while Defendants emphatically deny copying, *Shake It Off's* combining of public domain player and hater phrases is protected by the fair use doctrine.  All four of the fair use factors favor Defendants.  *Shake It Off* is undeniably transformative: while *Playas* is about fidelity and trust in a romantic relationship,

---

[2]   The Court confirmed that parties may file more than one motion for summary judgment as long as they are not simply duplicative.  *See* Rptr's Trans. of Proceedings Jan. 27, 2020 (Doc. 60) at 8:23-9:5.

1  *Shake It Off* uses the public domain phrases to advance its own transformative
2  message of independence and finding relief from criticism through music and dance.
3  And *Shake It Off* does so by setting those phrases to entirely different music and using
4  otherwise completely different lyrics.  Also, the use is only incidentally commercial,
5  did not interfere with Plaintiffs' right of first publication, and is no more than needed
6  to advance *Shake It Off*'s transformative purposes.  Lastly, *Shake It Off* has not had
7  any negative impact whatsoever on the market for *Playas*.  *See below* at 17-24.

8       Defendants' Second Motion for Summary Judgment should be granted.

9      **(b)**    <u>**Summary of Uncontroverted Facts**</u>

10         **(1)**    **Plaintiffs Co-Author the *Playas* Musical Composition**

11      Plaintiffs are co-authors of the musical composition *Playas*, a romantic love
12  song in the R&B pop, or "Rhythmic," genre.  Facts 308, 393, 453.  In *Playas*, the
13  singer sings to her romantic partner and is deeply attached to him and their
14  relationship.  She reassures him that, despite "so-called friends" trying behind his back
15  to break them up, she will never let him go and he can trust her love as she trusts his
16  love.  Facts 453-58.  The chorus of *Playas* includes the following lyrics:

17      Playas, they gon' play / And haters, they gonna hate / Ballers, they gon'
18      ball / Shot callers, they gonna call / That ain't got nothing to do / With
19      me and you / That's the way it is / That's the way it is
20  *See* Anderson Decl. Ex. 147.

21         **(2)**    **Plaintiffs Assign to Their Music Publishers Their Rights to**
22             **Sue for Infringement and the Claim They Assert in this Case**

23      As co-authors of *Playa*, Plaintiffs agreed to equal, 50% interests in the *Playas*
24  musical composition.  Facts 308.  However, each Plaintiff assigned to a music
25  publisher at least half of his copyright interest in *Playas*.  Facts 320, 346.  <u>Importantly,</u>
26  <u>each Plaintiff also assigned to his music publisher all of his rights to sue for</u>
27  <u>infringement of the *Playas* copyright, including the claim Plaintiffs assert in this case</u>.
28  Facts 309-23, 335-52.

### (3) *Playas* **Is Recorded by 3LW and Released as a Single in 2001**

*Playas* was recorded by a musical group, 3LW, and released as a single in May 2001.  Fact 487.  Plaintiffs contend that in 2001 a music video of 3LW performing *Playas* was included in an MTV television show, TRL (Total Request Live), and 3LW performed *Playas* during a 2001 TRL concert tour of some eleven different groups.  Fact 394.  *Playas* was never included in the soundtrack of any motion picture, television show, or commercial.  Facts 395-97.  *Playas* received only limited radio airplay, largely in approximately three months in 2001 on Rhythmic radio stations. *See, e.g.*, Facts 424-433.

### (4) **Before** *Shake It Off***, the Allegedly Copied Player and Hater Phrases Were Already Prevalent in Pop Culture and Music**

Plaintiffs admit that player and hater phrases, including players gonna play and haters gonna hate, were part of the urban vocabulary before *Playas*, and are each public domain and free for anyone to use.  Facts 365-66, 490-91, 493-94.  Plaintiffs also admit that at least by 2013 and before *Shake It Off*'s creation in 2014, player and hater phrases, including phrases such players gonna play and haters gonna hate, were part of popular culture, including in music, television, movies, articles, books, and even clothing.  Fact 367.

### (5) **In 2014, Taylor Swift, Max Martin, and Shellback Create** *Shake It Off*

In February 2014—thirteen years after *Playas*' claimed 2001 heyday and when player and hater phrases were, as plaintiff Hall testified, part of popular culture—defendants Taylor Swift, Karl Martin Sandberg, professionally known as Max Martin, and Karl Johan Schuster, professionally known as Shellback, created *Shake It Off*.  Facts 369, 380-82.  None of them had ever heard *Playas* or heard of 3LW, and Plaintiffs do not contend that *Playas* was ever provided to any of them.  Facts 383-91.

Nor is there a reasonable, non-speculative factual basis to conclude they somehow heard *Playas*.  Ms. Swift, who wrote *Shake It Off*'s lyrics, was only eleven

years old and a country music devotee in 2001 when *Playas* was released as a single; she did not watch TRL until several years after the 2001 episode that allegedly included a 3LW music video; and she did not go to clubs or concerts.  Facts 382, 394, 414-15, 418-19, 421.  *Playas* is an R&B pop song.  Fact 393.  In 2001, two radio stations played R&B pop songs in Ms. Swift's hometown, and she was not allowed to, and did not, listen to those stations.  Facts 413-14, 423.  And, in any event, one of the stations never played *Playas* and the other played it only 83 times in 2001.[3]  Facts 424, 426.  In 2001, Max Martin was living in Sweden; his musical background was rock; and while he worked with A-list pop artists such as Britney Spears and Backstreet Boys in his recording studio in Sweden, he did not listen to pop music or work with R&B singers.  Facts 435-37.  Shellback was only 16 years old and also living in Sweden in 2001; his background was heavy metal; and he did not start working with Max Martin until 2007.  Facts 442-445.

Further, in 2014 *Playas* was not the only source of players gonna play and haters gonna hate phrases.  Rather, Plaintiffs have conceded that the phrases were public domain and commonplace long before *Shake It Off*.  Facts 364-67, 369, 490-91, 493-94.  Ms. Swift had heard the phrases commonly used in middle school and elsewhere, along with other idioms like take a chill pill or say it don't spray it.  Fact 370.  At the 2013 Billboard Music Awards, she performed wearing a t-shirt, bought at a retail store, emblazoned with "Haters Gonna Hate."  Fact 367.  Later that year, she attended the 2013 Country Music Awards and heard Eric Church perform his song, *The Outsiders*, which includes the lyrics, "Yeah, the player's gonna play and a haters gonna hate / And a regulators born to regulate."  Facts 372-73.

///

---

[3]     As an indication of how few 83 plays in a year is, in 2001 that radio station played the top song of the year 1,402 times.  Fact 427.  Also, in 2001 that station played each of the top ten songs over 800 times—roughly ten times the number of plays that *Playas* had on that same radio station that year.  Fact 428.

5

Ms. Swift included versions of the commonplace phrases players gonna play and haters gonna hate in *Shake It Off*, a song about independence and freedom from criticism. *Shake It Off* begins with the singer identifying critical things people say about her, then stating that she is just going to "shake off" that criticism and find comfort in music and dance. Facts 464-65, 473. The lyrics of *Shake It Off's* chorus are:

> 'Cause the players gonna play, play, play, play, play / And the haters
> gonna hate, hate, hate, hate, hate / Baby, I'm just gonna shake, shake,
> shake, shake, shake / Shake it off / Shake it off /
> Heartbreakers gonna break, break, break, break, break / And the fakers
> gonna fake, fake, fake, fake, fake / Baby, I'm just gonna shake, shake,
> shake, shake, shake / Shake it off / Shake it off

*See* T. Swift Decl. Ex. 116.

### (6) Plaintiffs File this Infringement Action on Narrow Grounds

In September 2017, Plaintiffs filed this action, alleging a single claim for copyright infringement. Fact 327. Plaintiffs do not claim ownership of the phrases players gonna play and haters gonna hate and do not claim copying of any music. Facts 362, 489-91, 492-94. Rather, Plaintiffs allege that *Shake It Off* copies *Playas* because each song combines a variation of a players gonna play phrase and a haters gonna hate phrase, and includes two other but very different tautological phrases. Facts 363, 497, 503. As Mr. Hall admitted in his deposition, Plaintiffs contend that *Shake It Off* copies the idea of combining players gonna play with haters gonna hate. Fact 495.

### (7) Plaintiffs Ask Their Music Publishers to Assign the Alleged Claim to Them, But Their Music Publishers Decline

When they filed this action, Plaintiffs ignored that they had assigned the alleged copyright infringement claim to their respective music publishers. After Defendants raised that fact, Plaintiffs sent their music publishers e-mails in January 2018 asking

1  that within two business days their music publishers grant the alleged claim back to
2  Plaintiffs so that they could pursue this action.  Facts 329-31, 355-56.

3      Sony Music Publishing, whose companies include Mr. Hall's music publisher,
4  considered his request and, two weeks later, declined, explaining that, having
5  performed an internal evaluation and consulted an expert musicologist, it "concluded
6  that there was no merit to the infringement claim."  Facts 324-26, 332-34.  A
7  representative of Universal Music Publishing Group ("UMPG"), whose companies
8  include Mr. Butler's music publisher, initially did not object to him pursuing the
9  claim.  But within two weeks, UMPG wrote declining to grant to him the right to
10  pursue the claim.  Facts 353, 357-359.  Mr. Butler did not rely on UMPG's initial
11  response.  Fact 360.

12      After their music publishers refused to assign to Plaintiffs the claim they assert
13  in this action, their manager unsuccessfully lobbied a United States Congressman to
14  get a House sub-committee to intervene.  Fact 361.

15      **(c)**   **Procedural Posture**

16      At the outset of this action, Defendants moved to dismiss the Complaint for
17  failure to state a claim, raising that the Complaint did not allege copying of protected
18  expression.  Doc. 20.  The Court granted the motion but that ruling was reversed on
19  appeal.  *Hall v. Swift*, 786 F. App'x 711, 712 (9th Cir. 2019).  The Court of Appeals
20  ruled only that Plaintiffs had plausibly alleged originality in *Playas*' so-called four-
21  part lyrical phrase.  The Court of Appeals did not reach other issues, including that
22  the songs are not substantially similar under the extrinsic test.  *Id.* at 712, n.1.

23      On remand, this Court set a separate schedule for early expert disclosures and
24  discovery as to the extrinsic test.  Doc. 87.  After that expert discovery was completed,
25  Defendants moved for summary judgment as to that issue.  On December 9, 2021, the
26  Court denied the motion.  Doc. 104.  Defendants timely filed their Motion to Amend
27  or Reconsider (Doc. 108), which was taken under submission and is pending before
28  ///

the Court.  In the meantime, fact discovery has closed and expert discovery as to, *e.g.*, damage issues, closes on August 18, 2022.

## 2.   DEFENDANTS' MOTION FOR SUMMARY JUDGMENT SHOULD BE GRANTED

### (a)   The Standards Applicable to this Motion

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a).  Once the movant shows that summary judgment is appropriate, "the burden shifts to the non-moving party to set forth, by affidavit or as otherwise provided in Rule 56, specific facts showing that there is a genuine issue for trial." *F.T.C. v. Stefanchik*, 559 F.3d 924, 927-28 (9th Cir. 2009) (citation omitted). "[M]ere speculation … is insufficient to defeat summary judgment." *Hill v. Walmart Inc.*, 32 F.4th 811, 818 (9th Cir. 2022).  Also, summary judgment is proper "[i]f the evidence is merely colorable, or is not significantly probative…." *Id.* at 822 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### (b)   Plaintiffs Do Not Own the Claim They Assert in this Action

#### (1)   Authors May Assign the Right to Sue for Copyright Infringement

Plaintiffs' action is properly dismissed for lack of standing because they assigned to their respective music publishers the exclusive rights to sue for infringement of the *Playas* copyright, including the specific claim they assert here.

8

Section 501 of the Copyright Act provides that "the legal or beneficial owner of an exclusive right under a copyright is entitled . . . to institute an action for any infringement of that particular right committed while he or she is the owner of it." 17 U.S.C. § 501(b). Ownership of copyright rights vests initially in the author and may be transferred by assignment or exclusive license. 17 U.S.C. § 201(a), (d); *Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1003 (9th Cir. 2015). Beneficial owners include "author[s] who ha[ve] parted with legal title to the copyright in exchange for percentage royalties based on sales or license fees." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1144 (9th Cir. 2003) (citation omitted).

A copyright owner can, however, transfer the right to sue for past, present, or future infringements so long as the transferee is an owner of that copyright. *Silvers v. Sony Pictures Entm't, Inc.*, 402 F.3d 881, 890, 890 n.1 (9th Cir. 2005) (*citing with approval* ABKCO *Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980-81 (2d Cir. 1991) (grant of right to pursue and control infringement claims was valid when coupled with assignment of copyright rights)). Discovery has confirmed that is exactly what Plaintiffs did here.

### (2)    Mr. Hall Assigned to Famous Music All of His Rights to Sue for Infringement of the *Playas* Copyright

In 1992, Mr. Hall, individually and doing business as "Bam Publishing," entered into an Exclusive Songwriter and Co-Publishing Agreement with Famous Music Corporation, which later converted to a limited liability company and changed its name to Famous Music LLC ("Famous Music"). Facts 309-11, 324. That Co-Publishing Agreement governs Mr. Hall's rights in all musical compositions—which the Co-Publishing Agreement refers to as "Compositions"—that he wrote or co-wrote during the Co-Publishing Agreement's term. Facts 312. He has admitted that *Playas* is one of those Compositions and is governed by his Co-Publishing Agreement. Facts 318.

///

In Section 2(a) of his Co-Publishing Agreement, Mr. Hall assigned to Famous Music and another publisher, Groove Asylum Music Publishing, Inc., 66 2/3% of Mr. Hall's copyright interests in the Compositions, including *Playas*.  Facts 313-14, 320-21.  As a result, he remained a co-owner of legal title in the *Playas* copyright.  While owners of legal title to a copyright or exclusive rights under it have the right to license or exploit the copyrighted work (*see, e.g.*, <u>*Selznick v. Turner Ent. Co.*, 990 F. Supp. 1180, 1187 (C.D. Cal. 1997)</u> (only owners or co-owners "of legal title to [a] work" may license and exploit the work)), Mr. Hall assigned that right to Famous Music in Section 3 of his Co-Publishing Agreement.  That Section provides that, "[n]otwithstanding [the] co-ownership" of the copyrights, Mr. Hall's "grant, conveyance and assignment to [Famous Music] include[s] … the sole, exclusive and universal right, on behalf of [Mr. Hall and Famous Music] … to administer, use and exploit all legal rights, titles and interests in the Compositions, of every kind, nature, and description[.]"  Anderson Decl. Ex. 131 at 3, § 3(b).

Consistent with his agreed-upon role as a passive participant in his music publisher's exploitation of the Compositions, including *Playas*, in Section 19 of his Co-Publishing Agreement, Mr. Hall transferred to Famous Music "the sole and exclusive right to take (or refrain from taking) such action as [Famous Music] deems necessary, on behalf of [Famous Music and Mr. Hall], to protect all legal rights and interests in the Compositions, including, but not limited to, the right to institute or defend against any legal action, claim, demand or other proceeding affecting the Compositions, as well as to resolve such matters in [Famous's] sole discretion."  Fact 315, 318.  He also signed a separate Assignment in which he assigned to Famous Music "any and all of [his] rights of every kind, nature and description," in "any past, present and future legal causes of action respecting infringing of the Compositions…."  Facts 316, 319.  Mr. Hall has admitted that his Assignment includes the claim he asserts in this action.  Facts 317-19, 323.  Indeed, in January 2018 he urgently

///

1    requested that Famous Music assign the claim to him so that he could pursue this
2    action.  Facts 329-30.  However, Famous Music declined.  Fact 333.

3           Finally, Plaintiffs have suggested that Mr. Hall might have standing to sue as a
4    beneficial owner of the *Playas* copyright.  However, he is not a beneficial owner
5    because, by retaining a portion of the copyright, he did not "part[] with legal title."
6    *Warren*, 328 F.3d at 1144.  Further, in his Co-Publishing Agreement he assigned all
7    rights to sue for infringement of the *Playas* copyright, and in his Assignment he
8    expressly assigned "all of [his] rights *of every kind, nature, and description*" in claims
9    for infringement.  Fact 316 (emphasis added).  By the plain and unambiguous
10   language of Mr. Hall's Co-Publishing Agreement and Assignment, all rights to assert
11   the claim he asserts in this case—whether as a beneficial owner or under any other
12   standing theory he might try to invoke—were assigned to Famous Music, for it and
13   its successors to exercise or decline to exercise in its or their sole discretion.  Indeed,
14   all of these provisions in Mr. Hall's Co-Publishing Agreement and Assignment would
15   be meaningless if he could avoid them just by suing as a beneficial owner or otherwise.

16          Any and all rights that Mr. Hall had or could have to assert the claim he asserts
17   in this action belong to Famous Music, not him.  Accordingly, he lacks standing and
18   his claim must be dismissed.

19          **(3)    Mr. Butler Also Assigned to His Music Publisher All of His**
20                   **Rights to Sue for Infringement of the *Playas* Copyright**

21          Mr. Butler lacks standing for essentially the same reasons.

22          In 1999, Mr. Butler entered into a Co-Publishing Agreement with three Zomba
23   companies (collectively, "Zomba").  Facts 335-39.  That Co-Publishing Agreement
24   governs   his   rights   in   all   musical   compositions—likewise   referred   to   as
25   "Compositions"—that he wrote or co-wrote during the agreement's term, and he has
26   admitted that includes *Playas*.  Fact 345.

27          In Section 3.02 of his Co-Publishing Agreement, he assigned to Zomba 50% of
28   his copyright interest in the Compositions.  Fact 340.  In Section 3.03, he assigned to

Zomba all rights "to administer and grant rights and licenses in the Compositions … and to exercise all rights in the Compositions as fully as if [Zomba] were the sole owner of the Compositions and such copyrights (or to refrain from exploiting and exercising any and all such rights, in [Zomba's] sole discretion)."  Anderson Decl. Ex. 137 at 8, § 3.03.

Also consistent with his agreed-upon role as a passive participant in his music publisher's exploitation of the Compositions, in Section 8.06(b) of his Co-Publishing Agreement Mr. Butler granted Zomba the "sole right, but not the obligation, to initiate, prosecute, defend, settle, and compromise, in [Zomba's] sole discretion, any and all claims, demands, lawsuits, actions, or other proceedings in respect of the Compositions," including any actions "against any alleged infringer of any Composition."  Fact 342.  In addition, Mr. Butler signed a separate Assignment in which, after assigning to Zomba 50% of his copyright interest in *Playas*, he goes on to also assign to Zomba "any and all causes of action for infringement of the same, and any other claims, demands or causes of action of whatsoever nature pertaining to the Compositions, whether past, present or future…, to be held by [Zomba], and its affiliates, successors and assigns, fully, entirely, and absolutely."  Facts 341, 343, 346. He admits his Assignment to Zomba includes the claim in this action.  Facts 348-52.

Mr. Butler further confirmed that he did not have the claim he asserts in this action when, in January 2018, he, through his manager, urgently asked UMPG to "grant" him the claim so that he could pursue this action.  Facts 355-56.  A UMPG representative initially replied by e-mail that UMPG did not object to him pursuing the claim.  But UMPG quickly, and before Mr. Butler took any action in reliance on the e-mail, expressly declined to grant those rights to him.  Facts 357-60.  The initial e-mail also is irrelevant because standing "is based on facts that exist at the time of filing," and Mr. Butler indisputably lacked the right to sue when he filed this action four months earlier.  *See Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1171 (9th Cir. 2013) (copyright interest acquired after filing does not confer standing).

1    Finally, and as with Mr. Hall, Mr. Butler is not a beneficial owner of the *Playas*

2    copyright because he did not "part[] with legal title" to it. *Warren*, 328 F.3d at 1144.

3    Also, any right Mr. Butler had to sue as a beneficial owner or under any other standing

4    theory is subsumed within his grant to his music publisher of all of his rights to sue.

5    *See above* at 11-12.  To conclude otherwise would render all of these provisions of in

6    his Co-Publishing Agreement and Assignment meaningless.

7          Accordingly, both Mr. Hall and Mr. Butler lack standing to assert the claim they

8    assert and, for that reason alone, summary judgment should be granted.

9          **(c)**   **The Evidence Does Not Raise a Genuine Dispute as to Copying**

10         As an independent ground for summary judgment, Plaintiffs cannot raise a

11   genuine dispute as to whether copying occurred.  "[A]bsent copying, there can be no

12   infringement of copyright, regardless of the extent of similarity" between the parties'

13   works.  2 M. NIMMER & D. NIMMER, NIMMER ON COPYRIGHT § 8.01[A] (2022);

14   *Skidmore v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020) (in addition to other

15   requirements, a "plaintiff must prove that a defendant copied the work").  Copying is

16   proven circumstantially by evidence of either (1) "striking similarity" or (2) access

17   plus substantial similarities between the defendant's and the plaintiff's works that are

18   probative of copying.  *Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*, 922 F.3d 946,

19   952 (9th Cir. 2019).  Plaintiffs fail to raise a genuine dispute under either theory.

20         **(1)**   ***Playas* and *Shake It Off* Are Not Strikingly Similar**

21         "To show a striking similarity between works, a plaintiff must produce evidence

22   that the accused work *could not possibly* have been the result of independent creation."

23   *Stabile v. Paul Ltd.*, 137 F. Supp. 3d 1173, 1188 (C.D. Cal. 2015) (citations omitted).

24   "In other words, as a matter of logic, the only explanation for the similarities between

25   the two works must be 'copying rather than … coincidence, independent creation, or

26   prior common source.'"  4 NIMMER ON COPYRIGHT § 13D.07[A] (quoting *Skidmore*,

27   952 F.3d at 1064).  Expert testimony is necessary to establish striking similarity in

28   music cases.  *Id.* at 13D.07[C][2].  However, Plaintiffs' expert concluded only that

                                         13

1    there "*could have*" been copying.  Facts 378-79 (emphasis added).  That precludes

2    striking similarity.  *See Stabile*, 137 F. Supp. 3d at 1188 (expert's equivocation fails

3    to establish striking similarity (gathering cases)).

4           Furthermore, the evidence shows copying is not even the *likely* explanation for

5    *Shake It Off*'s inclusion of tautologies or players play and haters hate phrases.  It is

6    undisputed that tautologies are commonplace, including in lyrics (Facts 374-75) and

7    that players gonna play and haters gonna hate were commonplace phrases before

8    *Playas* (Fact 364-66).  Indeed, in 2000 and before the release of *Playas*, the recording

9    artist R Kelly released a song whose lyrics were so close to *Playas* – "Players wanna

10   play / Ballers wanna ball / Rollers wanna roll" – that Plaintiffs felt R Kelly had copied

11   them.  Fact 65; Ex. 36 (Doc. 92-42 (R. Kelly lyrics)); Anderson Decl., Ex. 145, at

12   146:18-147:23.  And, importantly, by 2013 and before *Shake It Off* was created, these

13   phrases were not only part of popular culture (Facts 367, 369) but were heard by Ms.

14   Swift in middle school and elsewhere, including at the 2013 country Music Awards

15   where Eric Church performed his song, *The Outsiders*, with the lyrics, "the player's

16   gonna play, and a haters gonna hate, and a regulators born to regulate" (Facts 370-73).

17          Plaintiffs fail to raise a genuine dispute as to striking similarity.

18          **(2)    The *Shake It Off* Songwriters Did Not Have Access to *Playas***

19          To prove copying without striking similarity, Plaintiffs must present evidence

20   of *both* access *and* substantial similarity probative of copying.  *Rentmeester v. Nike,*

21   *Inc.*, 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore,*

22   952 F.3d at 1051.  To prove access, a plaintiff must show a "reasonable possibility,

23   not merely a bare possibility, that an alleged infringer had a chance to view the

24   protected work." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016) (quoting *Art*

25   *Attacks Ink, LLC v. MGA Entm't, Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009)).  Access

26   may be shown either by "(1) establishing a chain of events linking the plaintiff's work

27   and the defendant's access, or (2) showing that the plaintiff's work has been widely

28   disseminated." *Id.*  In either event, "[a]ccess may not be inferred through mere

14

1   speculation or conjecture." *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 482 (9th

2   Cir. 2000) (citation omitted), *overruled on other grounds by Skidmore*, 952 F.3d 1051.

3   ### (i)   No Chain of Events Supports Access

4   A chain-of-events access theory requires "evidence of a nexus" between (1) a

5   person with possession of the plaintiff's work and (2) the individuals who created the

6   allegedly infringing work.  *Loomis*, 836 F.3d at 995-96.  Ms. Swift, Max Martin, and

7   Shellback created *Shake It Off* (Facts 380-82) and Plaintiffs admit that Plaintiffs did

8   not provide *Playas* to any of them and that no one has told Plaintiffs that any of them

9   received or heard *Playas*.  Facts 389-91.

10   Mr. Hall does claim to have said "hello" to Ms. Swift sometime between 2007

11   and 2011 when she visited a recording studio in which he was present.  But there was

12   no mention of *Playas* or 3LW.  Anderson Decl. Ex. 145 at 164:20-166:6.  Mr. Hall

13   claims he met Max Martin sometime between 2006 and 2012 when Max Martin

14   visited a recording studio in which Mr. Hall was present.  Mr. Hall also claims to have

15   sent him texts and an e-mail in 2010.  But, again, there was no mention of *Playas* or

16   3LW in the recording studio or the texts and e-mail.  *Id*. at 172:7-173:18; 175:9-176:4,

17   176:25-178:22.

18   Plaintiffs fail to raise a genuine dispute as to a chain-of-events access theory.

19   ### ii.   Plaintiffs' Theory of Access through Wide

20   ### Dissemination Also Fails

21   Plaintiffs also fail to raise a genuine dispute that *Playas* was widely

22   disseminated so as to create a "reasonable possibility" that the creators of *Shake It Off*

23   had access to it.  *Loomis*, 836 F.3d at 995.  "In most cases, the evidence of widespread

24   dissemination centers on the degree of a work's commercial success and on its

25   distribution through radio, television, and other relevant mediums," but the evidence

26   "will vary from case to case."  *Id.*

27   Plaintiffs contend that in 2001 *Playas* was a hit single, but they do not claim it

28   was a number one hit or even a top ten hit.  *Cf. ABKCO Music*, 722 F.2d at 998

15

(sufficient evidence of access based on wide dissemination where allegedly infringed song was "Number One" on the *Billboard Charts* in the United States for five weeks, and was one of the "Top Thirty Hits" in England for seven weeks); *Acuff–Rose Music, Inc. v. Jostens, Inc.*, 988 F. Supp. 289, 290 (S.D.N.Y. 1997) (widespread dissemination where "song was a hit and rose to number five on the national country charts" within a year before alleged infringement), *aff'd*, 155 F.3d 140, 141 (2d Cir. 1998). Nor was *Playas* omnipresent on radio. Plaintiffs apparently contend the song received radio play from late April to July 2001 before dropping off in late July. But a song playing on radio for roughly three months does not establish widespread dissemination. *See Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 281 (S.D.N.Y. 1991) (evidence that plaintiff's song was played on radio in Spring 1979 insufficient). As for television, Plaintiffs contend only that a 3LW *Playas* music video was played on a cable show, TRL, in 2001. Fact 394. They have produced no evidence that, for example, *Playas* was ever incorporated into a movie, television, or commercial soundtrack, or that it was nominated for or won a GRAMMY. Facts 395-403.

Further, dissemination rises to widespread dissemination only if it creates a "reasonable possibility" that the creator of the defendant's work heard the plaintiff's work. While that "reasonable possibility" may be shown by evidence that the plaintiff's work "saturat[ed] a relevant market in which both the plaintiff and the defendant participate[d]" (*Loomis*, 836 F.3d at 997), that is a high standard. *See, e.g., id.* at 998 (testimony that plaintiff's song received "tons of airplay" by Santa Barbara, California radio stations and was written about in local newspaper insufficient where defendants were only in Santa Barbara for ten days and no evidence they listened to radio or read newspaper); *see also Intersong-USA*, 757 F. Supp. at 281 (evidence of radio play in cities in which defendants lived was "insufficient basis to conclude that any [defendant] heard the song at that time"); *McRae v. Smith*, 968 F. Supp. 559, 563 (D. Co. 1997) (music performances in Colorado and Wyoming insufficient to establish access where defendants were not in those States at the time).

1   Here, Plaintiffs' claimed widespread dissemination of *Playas* is confined to
2   2001 and falls far short of establishing a "reasonable possibility" of access by Ms.
3   Swift.  At the time, she was eleven years old and lived with her parents in Wyomissing
4   Hills, Pennsylvania.  Facts 413, 421.  Her radio listening was confined to country
5   music and her parents did not permit her to watch TRL until several years later.  Facts
6   414-19.  The two radio stations available in Wyomissing Hills in 2001 whose format
7   included R&B pop music such as *Playas* were not only stations she did not listen to,
8   but one station never played *Playas*, and the other played it only 83 times in all of
9   2001.  Facts 423-26.  As a result, Plaintiffs' weak theory of wide dissemination does
10   not extend to Ms. Swift.

11   Nor does Plaintiffs' claimed widespread dissemination in the U.S. in 2001
12   support a "reasonable possibility" of access by Max Martin or Shellback.  They were
13   born and raised in Sweden and began their music careers in rock and heavy metal
14   bands.  Facts 435-36, 443-44.  While Max Martin was actively producing and writing
15   pop music in Sweden in 2001 for A-list recording artists such as Britney Spears,
16   Backstreet Boys, and others, he never listened to pop music other than the music he
17   created, did not follow R&B, and did not watch TRL.  Facts 437.  He has never
18   subscribed to or read Billboard.  Fact 439.  In 2001, Shellback was only sixteen years
19   old, was in a heavy metal band, and also lived in Sweden.  Facts 442-44.  He did not
20   listen to radio, did not follow R&B or pop music, and did not watch TRL or read
21   Billboard.  Facts 446-451.  Plaintiffs' weak wide dissemination theory also does not
22   extend to Max Martin or Shellback.

23   Copying is a required element of the claim Plaintiffs assert and their failure to
24   submit evidence creating a genuine dispute as to striking similarity or access is an
25   independent ground for summary judgment.

26   **(d)     Plaintiffs Also Cannot Avoid the Fair Use Doctrine**

27   Defendants emphatically deny that *Shake It Off* copies anything from *Playas*.
28   But even if copying were assumed for argument's sake, the fair use doctrine extends

17

1  to *Shake It Off*'s combination of public domain player and hater phrases and the idea

2  of tautologies, in the creation of a new and different song.

3       Fair use "permits and requires courts to avoid rigid application of the copyright

4  statute when, on occasion, it would stifle the very creativity which that law is designed

5  to foster." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). The

6  Copyright Act sets forth four factors that courts apply in determining fair use: (1) "the

7  purpose and character of the use," (2) "the nature of the copyrighted work," (3) "the

8  amount and substantiality of the portion used in relation to the copyrighted work as a

9  whole," and (4) "the effect of the use upon the potential market for or value of the

10 copyrighted work." 17 U.S.C. § 107(1)-(4). "Where no material, historical facts are

11 at issue and the parties dispute only the ultimate conclusions to be drawn from those

12 facts," fair use may be decided on summary judgment. *Seltzer v. Green Day, Inc.*,

13 725 F.3d 1170, 1175 (9th Cir. 2013). Each factor favors fair use here.

14       **(1)    The Purpose and Character of the Use**

15            **(i)    *Shake It Off*'s Use of Player and Hater Phrases Is**

16                 **Transformative**

17       "The first factor in the fair use inquiry is 'the purpose and character of the use,

18 including whether such use is of a commercial nature or is for nonprofit educational

19 purposes.'" *Seltzer*, 725 F.3d at 1175 (quoting 17 U.S.C. § 107(1)). "[T]he 'central

20 purpose' of this factor is to see 'whether and to what extent the new work is

21 transformative.'" *Id.* at 1175-76 (quoting *Campbell*, 510 U.S. at 579). A work is

22 transformative if it "adds something new, with a further purpose or different character,

23 … with new expression, meaning or message." *Id.* (quoting *Campbell*, 510 U.S. at

24 579). "What is critical is how the work in question appears to the reasonable

25 observer." *Id.* at 1181 (quoting *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013)).

26 While fair use cases sometimes involved parody, there is no requirement that a work

27 "comment on the original." *Id.* at 1177 (citing, *inter alia*, *Cariou*, 714 F.3d at 708

28 (work that did not "comment on, relate to the historical context of, or critically refer

18

1   back to the original work[]" nevertheless transformative where it presented a

2   "fundamentally different aesthetic")).  The "more transformative the new work, the

3   less will be the significance of other factors … that may weigh against a finding of

4   fair use." *Campbell*, 510 U.S. at 579.

5       Plaintiffs claim that *Shake It Off* copies the idea of combining a public domain

6   players play phrase with a public domain haters hate phrase and two otherwise

7   different public domain tautologies, to depict a "world … full of untrustworthy

8   people."  Fact 460.  While that is disputed, it is beyond dispute that *Shake It Off* uses

9   its phrases to create a new work with dramatically different meaning and message and

10  "new aesthetics, new insights and understandings." *Seltzer*, 725 F.3d at 1176 (quoting

11  Pierre Leval, *Toward a Fair Use Standard*, 103 HARV. L. REV. 1105, 1111 (1990)).

12      In *Playas*, the focus is on the singer's romantic relationship.  The singer uses

13  the phrases to convey to her partner that she is not concerned about "so-called friends"

14  who are trying to interfere with their relationship, and that her partner should not be

15  concerned either, because their relationship is trusting and secure.  Facts 453-57.

16  While *Playas* is a love song about trust in a romantic relationship, *Shake It Off* is about

17  individual freedom, independence from critics, and finding comfort in music and

18  dance.  Facts 461-482.  With *Shake It Off*, Ms. Swift took a comedic, empowering

19  approach to making people feel better through music and through dance and through

20  independence.  T. Swift Decl. at 2-3, ¶ 8.  *Shake It Off* includes the allegedly copied

21  phrases in presenting a different solution to a different type of adversity than what is

22  identified in *Playas*.  In doing so, *Shake It Off* indisputably adds "new insights and

23  understandings" to these phrases, and creates a dramatically different message for its

24  listeners. *Seltzer*, 725 F.3d at 1176.

25      *Shake It Off* also is a very different artistic work from *Playas* overall, and the

26  many differences emphasize *Shake It Off's* transformative nature.  For example, while

27  *Playas* is an R&B pop song with a soulful and intimate mood, *Shake It Off* is an

28  upbeat, defiant pop song.  Facts 393, 453-54.  *Shake It Off's* repetition of "play,"

1  "hate," "shake," etc., further expresses defiance and joyfulness, and contributes to a

2  lyrical and musical dynamism, mood, and pace entirely different from *Playas*.  Fact

3  462.

4         This is decidedly not "the typical 'non-transformative' case" where the use

5  "makes no alteration to the *expressive content or message* of the original work."

6  *Seltzer*, 725 F.3d at 1177; *see also Dr. Suess Enterps., L.P. v. ComicMix LLC*, 983

7  F.3d 443, 454 (9th Cir. 2020) (defendant did not transform Dr. Suess stories by

8  replacing original characters and leaving story and drawings otherwise intact).

9  Rather, *Shake It Off* uses the phrases—which Plaintiffs concede are public domain—

10 as "raw material" in its own creative expression that is nothing like *Playas*.  *Seltzer*,

11 725 F.3d at 1176-77 (use of drawing that said "nothing about religion" in backdrop

12 for video about religion was fair); *Cariou*, 714 F.3d at 706 (defendant's "hectic and

13 provocative" works incorporating plaintiff's "serene and deliberately composed"

14 photographs were transformative).  *Shake It Off* is a highly transformative work.

15                **(ii)    *Shake It Off's* Use Is Not Primarily Commercial**

16        Under the first factor, the Court also considers whether the defendant's use is

17 "of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1).

18        While *Shake It Off* is a commercial work, that does not carry "presumptive force

19 against a finding" of fair use.  *Campbell*, 510 U.S. at 584.  Rather, the court considers

20 "the degree to which the new user exploits the copyright for commercial gain—as

21 opposed to incidental use as part of a commercial enterprise." *Seltzer*, 725 F.3d at

22 1178.  In *Seltzer*, for example, the band Green Day's use of a copyrighted drawing in

23 a video backdrop at concerts was only incidentally commercial because, while the

24 "concert was undoubtedly commercial in nature," the band "never used [plaintiff's

25 work] to market the concert, CDs, or merchandise." *Id.*  Also, the "more

26 transformative the new work, the less will be the significance of other factors, like

27 commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at

28 579; *SOFA Entm't v. Dodger Prods., Inc.*, 709 F.3d 1273, 1278-79 (9th Cir. 2013)

1  ("[B]ecause [defendant's] use of the clip [from television show] is transformative, the
2  fact that [defendant's musical] is a commercial production is of little significance.").

3        The same is true here.  Defendants did not sell copies of *Playas*, or use *Playas*
4  to market or promote *Shake It Off*.  Instead, the alleged *combination* of public domain
5  tautological phrases are the lyrics of a song that is highly transformative.  Accordingly,
6  the first factor weighs strongly in favor of fair use.

7              **(2)    The Nature of Plaintiffs' Copyrighted Work**

8        Under the second factor, courts consider whether the first work is creative
9  (meriting stronger protection) or factual, and whether the first work has been
10 published (meriting weaker protection).  *Seltzer*, 725 F.3d at 1178.

11       While *Playas* is a creative musical work, it had been published for thirteen years
12 by the time of *Shake It Off*'s release in 2014.  Fact 487.  Plaintiffs accordingly
13 controlled "the first public appearance" of *Playas*, a consideration that favors fair use.
14 *Seltzer*, 725 F.3d at 1178; *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820 n.31 (9th Cir.
15 2003) (same).  Moreover, "the second factor may be of limited usefulness where [a]
16 creative work of art is being used for a transformative purpose." *Bill Graham Archives*
17 *v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612 (2d Cir. 2006).  Here, the alleged use
18 of a published work is highly transformative and, accordingly, this factor favors fair
19 use, but, in any case, should not be given great weight in the analysis.  Therefore, to
20 the extent this factor is material to the analysis at all, it supports a finding of fair use.

21           **(3)    The Amount and Substantiality of the Portion Used**

22       The third factor examines the "'amount and substantiality' of the portion of the
23 original copyrighted work used 'in relation to the [original] copyrighted work as a
24 whole.'"  17 U.S.C. § 107(3).  The amount and substantiality used are considered "in
25 relation to the [defendant's] justification for the use." *Seltzer*, 725 F.3d at 1178.
26 Notably, "[t]his factor captures the fact that an allegedly infringing work that copies
27 little of the original is likely to be a fair use." *Id.*
28 ///

21

1    Here, copying is disputed, but the alleged use *of Playas* in *Shake It Off* is not

2    only minimal, it is ephemeral.  There are zero musical similarities and, out of all the

3    lyrics, Plaintiffs claim copying only of the idea of combining two public domain

4    phrases and adding other tautologies.  Facts 488-504.  That idea is abstract and not a

5    substantial portion of *Playas*.[4]  *See also Fisher v. Dees*, 794 F.2d 432, 436 (9th Cir.

6    1986) (use of 6 of 38 bars of music, including "recognizable main theme," in parody

7    song was fair); *Threshold Media Corp. v. Relativity Media, LLC*, No. CV 10-09318,

8    2013 WL 12331550 at *11 (C.D. Cal., Mar. 19, 2013) (use of 41 out of 189 seconds

9    (22%) of one audio recording and additional 28 out of 209 seconds (13%) of another

10   audio recording of same song, including music and lyrics, was fair).

11       For similar reasons, the allegedly copied material is not qualitatively significant

12   to *Playas*.   Plaintiffs cannot reasonably argue that *Shake It Off* copies the most

13   important part of *Playas* when they admit *Shake It Off* uses none of *Playas*' music and

14   only public domain phrases.  *SOFA Entm't*, 709 F.3d at 1279 (clip of television show

15   not qualitatively important to show where, *inter alia*, "doubtful that the clip on its own

16   qualifies for copyright protection"); *Stewart v. West*, No. CV 13-02449, 2014 WL

17   12591933 at *9 (C.D. Cal. Aug. 14, 2014) (use of spoken word introduction "without

18   any significant musical accompaniment" was not qualitatively significant).

19       But even if *Shake It Off* copied the "heart" of *Playas*, which it did not do, the

20   third factor would still favor fair use because the allegedly copied decision to use the

21   public domain phrases is relevant to *Shake It Off*'s transformative purpose.  *Kelly*, 336

22   F.3d at 820-21; *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 326 (S.D.N.Y.

23

24

---

25   [4]    Comparing the two songs' lyrics, the allegedly copied lines consist of

26   approximately 102 out of the 606 total words in *Playas* (16.5%).  *See* Anderson Decl.
     Ex. 147.  Even that low figure is improperly exaggerated because Plaintiffs contend

27   only that the idea of *combining* player and hater phrases was copied, rather than the

28   words themselves.  Fact 496.

1   2008) (third factor favored fair use where lyrics and music at heart of song "relevant

2   to defendants' commentary"); *see above* at 19-20.  This factor also favors fair use.

3              **(4)      The Effect on the Market for or Value of Plaintiffs' Work**

4              Finally, the Court considers the "secondary use's impact on the market for the

5   original work and the market for derivative works[.]" *SOFA Entm't*, 709 F.3d at 1280;

6   17 U.S.C. § 107(3).  "The market for potential derivative uses," however, "includes

7   only those that creators of original works would in general develop or license others

8   to develop." *Campbell*, 510 U.S. at 592.  "Where the secondary use is not a substitute

9   for the original and does not deprive the copyright holder of a derivative use, the fourth

10  factor weighs in favor of fair use." *SOFA Entm't*, 709 F.3d at 1280.

11             *Shake It Off* is not a market substitute for *Playas*.  *Shake It Off* includes

12  completely different music, is in a different genre, and includes virtually none of the

13  same lyrics.  Courts have recognized that highly transformative uses of only a small

14  amount of allegedly borrowed material are not market substitutes for the original.  *See,*

15  *e.g.*, *Red Label Music Pub., Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 986 (N.D. Ill.

16  2019); *Threshold Media*, 2013 WL 12331550 at *12 (It is "inconceivable that hearing

17  a [30-second] clip [of a song] would dissuade a listener from purchasing [the song] if

18  the listener were otherwise predisposed to do so.").  Unsurprisingly, Plaintiffs'

19  testimony confirms that *Shake It Off* has not usurped *Playas*' market share: Plaintiffs

20  were unable to attribute to *Shake It Off* any negative impact on *Playas* sales,

21  streaming, or royalties.  Facts 506-08, 510-11.  Indeed, Mr. Hall testified that he did

22  not believe *Shake It Off* caused people to stop listening to *Playas*.  Fact 505.

23             There is also no evidence that *Shake It Off* impaired any market for derivative

24  uses of *Playas*.  Plaintiffs cannot argue that Defendants' alleged use deprived them of

25  a licensing fee, because a copyright owner is "not entitled to a licensing fee for a work

26  that otherwise qualifies for the fair use defense[.]" *Leibovitz v. Paramount Pictures*

27  *Corp.*, 137 F.3d 109, 117 (2d Cir. 1998).  Rather, Plaintiffs must show impairment to

28  an existing or "traditional, reasonable, or likely to be developed [licensing] market"

1 for the type of use at issue.  *Bill Graham Archives*, 448 F.3d at 614-15.  And they have

2 not: Plaintiffs acknowledge that the use of player and hater phrases is widespread in

3 popular culture and in other works, yet Plaintiffs have apparently never obtained a

4 license for any of these uses.  Facts 367, 369, 372, 509.  *Shake It Off* cannot be

5 negatively affecting a market or potential market that does not exist.  *See, e.g.*, *Seltzer,*

6 *725 F.3d at 1179* (plaintiff failed to present evidence establishing defendant's use

7 harmed a market for his work); *Blanch v. Koons*, 467 F.3d 244, 258 n.9 (2d Cir. 2006)

8 (same).  Thus, like all others, the fourth factor favors fair use.

9       The highly transformative alleged use of the idea of combining versions of two

10 public domain phrases, together with consideration of the other fair use factors, leads

11 to only one conclusion: the "copyright law's goal of 'promoting the Progress of

12 Science and useful Arts,' U.S. Const., art. I, § 8, cl. 8, would be better served by

13 allowing [*Shake It Off*'s alleged use of the phrases] than by preventing it."  *Blanch,*

14 *467 F.3d at 259*.  Accordingly, the alleged use, even if proven, which Plaintiffs have

15 not done, is a non-infringing fair use.  17 U.S.C. § 107.

16 **3.**    **CONCLUSION**

17       Accordingly, summary judgment should be granted in Defendants' favor.

18

19 Dated: August 8, 2022

                         /s/ Peter Anderson

20                         Peter Anderson, Esq.

                        Sean M. Sullivan, Esq.

21                         Eric H. Lamm, Esq.

                        DAVIS WRIGHT TREMAINE LLP

22                         Attorneys for Defendants

23

24                         J. Douglas Baldridge, Esq.

                        Katherine Wright Morrone, Esq.

25                         VENABLE LLP

                        Co-counsel for Defendant

                        TAYLOR SWIFT

26

27

28