GERARD FOX LAW P.C.
Gerard P. Fox (SBN 151649)
gfox@gerardfoxlaw.com
Marina V. Bogorad (SBN 217524)
mbogorad@gerardfoxlaw.com
Olga Viner (SBN 282423)
oviner@gerardfoxlaw.com
1880 Century Park East, Suite 1410
Los Angeles, CA 90067
Telephone: (310) 441-0500
Facsimile: (310) 441-4447

*Attorneys for Plaintiffs*
SEAN HALL D.B.A. GIMME SOME HOT
SAUCE MUSIC AND NATHAN BUTLER
D.B.A. FAITH FORCE MUSIC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SEAN HALL d.b.a. GIMME SOME HOT SAUCE MUSIC, *et al*., | Case No.  2:17-cv-06882 MWF (ASx) |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' SECOND MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| TAYLOR SWIFT, *et al*., | Date:    October 3, 2022 |
| Defendants. | Time:    10:00 a.m. |

1

2

## **TABLE OF CONTENTS**

3

I.     General Governing Principles ............................................................. 2

II.    Plaintiffs Have Standing ................................................................... 3

III.   Plaintiffs Can Establish Copying ..................................................... 8

IV.    Defendants' Use is Not Fair ........................................................... 16

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Cases**

*29 Beekman Corp. v. Wansdown Properties Corp. N.V.*,
2021 WL 4481006 (S.D.N.Y. Sept. 29, 2021) ................................................8

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
722 F.2d 988 (2d Cir. 1983) .........................................................................15

*ABS Ent., Inc. v. CBS Corp.*,
908 F.3d 405 (9th Cir. 2018) ........................................................................21

*Alpi Int'l, Ltd v. Anga Supply, LLC*,
118 F. Supp. 3d 1172 (N.D. Cal. 2015) ........................................................11

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .................................................................................2, 13

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
11 F.4th 26 (2d Cir. 2021) ............................................................................21

*Arch Chemicals, Inc. v. Radiator Specialty Co.*,
653 F. Supp. 2d 1099 (D. Or. 2009) .............................................................10

*Arista Recs. LLC v. Myxer Inc.*,
2011 WL 11660773 (C.D. Cal. Apr. 1, 2011) ...............................................18

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
581 F.3d 1138 (9th Cir. 2009) ......................................................................13

*Atari Interactive, Inc. v. Redbubble, Inc.*,
515 F. Supp. 3d 1089 (N.D. Cal. 2021) ........................................................11

*Baxter v. MCA, Inc.*,
812 F.2d 421 (9th Cir. 1987) ..........................................................................9

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
448 F.3d 605 (2d Cir. 2006) .........................................................................25

*Blanch v. Koons*,
467 F.3d 244 (2d Cir. 2006) .........................................................................21

*BMG Rts. Mgmt. (US) LLC v. Glob. Eagle Ent. Inc.*,
2019 WL 6315533 (C.D. Cal. Sept. 9, 2019) ................................................23

*Braham v. Sony/ATV Music Publ'g*,
2015 WL 7074571 (C.D. Cal. Nov. 10, 2015) ..............................................12

*Broad. Music, Inc. v. Hirsch*,
104 F.3d 1163 (9th Cir. 1997) ........................................................................5

*Brophy v. Almanzar*,
2020 WL 8175605 (C.D. Cal. Dec. 4, 2020) ................................................22

*Cariou v. Prince,*
714 F.3d 694 (2d Cir. 2013) ...........................................................................21

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...........................................................................................2

*Copeland v. Bieber,*
789 F.3d 484 (4th Cir. 2015) .........................................................................18

*Corbello v. DeVito,*
777 F.3d 1058 (9th Cir. 2015) .........................................................................4

*Cortner v. Israel,*
732 F.2d 267 (2d Cir. 1984) .........................................................................5, 6

*DC Comics v. Towle,*
802 F.3d 1012 (9th Cir. 2015) .......................................................................12

*De Fontbrune v. Wofsy,*
39 F.4th 1214 (9th Cir. 2022) ........................................................................25

*Disney Enterprises, Inc. v. VidAngel, Inc.,*
371 F. Supp. 3d 708 (C.D. Cal. 2019) ...........................................................25

*Disney Enterprises, Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) .........................................................................24

*Dr. Seuss Enterprises, L.P. v. ComicMix LLC,*
983 F.3d 443 (9th Cir. 2020) .............................................................16, 20, 25

*DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC,*
870 F.3d 978 ............................................................................................4, 5, 6, 7

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.,*
2015 WL 12655484 (C.D. Cal. Nov. 19, 2015) ..............................................4

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.,*
2015 WL 12655556 (C.D. Cal. Oct. 1, 2015) ..................................................4

*Elvis Presley Enterprises, Inc. v. Passport Video,*
349 F.3d 622 (9th Cir. 2003) .....................................................................18, 25

*Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc.,*
2021 WL 511111 (W.D. Wash. Feb. 11, 2021) ..............................................12

*Fantasy, Inc. v. Fogerty,*
654 F. Supp. 1129 (N.D. Cal. 1987) ...............................................................5

*Feist Publications, Inc. v. Rural Telephone Service Co. Inc.,*
499 U.S. 340 (1991) ...........................................................................................3

*Fisher v. Dees,*
794 F.2d 432 (9th Cir. 1986) .........................................................................24

iii

*Fournier v. Erickson*,
    242 F. Supp. 2d 318 (S.D.N.Y. 2003) ............................................................23

*Frisby v. Sony Music Ent.*,
    2021 WL 2325646 (C.D. Cal. Mar. 11, 2021) .................................17, 22, 23, 25

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
    7 N.Y.3d 96 (N.Y. 2006) ...............................................................................8

*Furie v. Infowars, LLC*,
    401 F. Supp. 3d 952 (C.D. Cal. 2019) ...............................................16, 18, 23

*Gaylord v. United States*,
    595 F.3d 1364 (Fed. Cir. 2010) ........................................................................24

*Golden v. Michael Grecco Prods., Inc.*,
    524 F. Supp. 3d 52 (E.D.N.Y. 2021) ................................................................12

*Grant v. Trump*,
    563 F. Supp. 3d 278 (S.D.N.Y. 2021) ..............................................................25

*Gray v. Perry*,
    2018 WL 3954008 (C.D. Cal. Aug. 13, 2018) ...........................................10, 13

*Gray v. Perry*,
    2018 WL 5095118 (C.D. Cal. Oct. 17, 2018) ...................................................16

*Green v. Metro-Goldwyn-Mayer Studios Inc.*,
    2008 WL 11338272 (C.D. Cal. Nov. 24, 2008) ................................................10

*Haas Automation, Inc. v. Denny*,
    2013 WL 6502876 (C.D. Cal. Dec. 4, 2013) ....................................................11

*Harper & Row Publishers, Inc. v. Nation Enterprises*,
    471 U.S. 539 (1985) ...............................................................................17, 23

*Heim v. Universal Pictures Co.*,
    154 F.2d 480 (2d Cir. 1946) .............................................................................9

*Henley v. DeVore*,
    733 F. Supp. 2d 1144 (C.D. Cal. 2010) ...........................................................24

*Hill v. Walmart Inc.*,
    32 F.4th 811 (9th Cir. 2022) .............................................................................3

*Hilton v. Hallmark Cards*,
    599 F.3d 894 (9th Cir. 2010) ...........................................................................22

*Incredible Features, Inc. v. Backchina, LLC*,
    2021 WL 6337194 (C.D. Cal. Dec. 16, 2021) ..................................................25

*Intersong-USA v. CBS, Inc.*,
    757 F. Supp. 274 (S.D.N.Y. 1991) ...................................................................15

iv

*John Wiley & Sons, Inc. v. DRK Photo*,
  998 F. Supp. 2d 262 (S.D.N.Y. 2014)..................................................................4

*Kienitz v. Sconnie Nation LLC*,
  766 F.3d 756 (7th Cir. 2014)................................................................18, 24

*Leadsinger, Inc. v. BMG Music Pub.*,
  512 F.3d 522 (9th Cir. 2008)............................................................17, 23, 24

*Leibovitz v. Paramount Pictures Corp.*,
  137 F.3d 109 (2d Cir. 1998)..................................................................25

*Lennon v. Premise Media Corp.*,
  556 F. Supp. 2d 310 (S.D.N.Y. 2008)..................................................24

*Lester v. U2 Ltd.*,
  2009 WL 10673938 (C.D. Cal. Apr. 10, 2009)..................................12

*Love v. The Mail on Sunday*,
  2006 WL 4046180 (C.D. Cal. Aug. 15, 2006)......................................5

*Malibu Textiles, Inc. v. Label Lane Int'l, Inc.*,
  922 F.3d 946 (9th Cir. 2019)..................................................................9

*Mason v. Jamie Music Pub. Co.*,
  658 F. Supp. 2d 571 (S.D.N.Y. 2009)..................................................6

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986)..................................................................................2

*McGucken v. Pub Ocean Ltd.*,
  2022 WL 3051019 (9th Cir. 2022)..................................................18, 20

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
  795 F.3d 997 (9th Cir. 2015)..................................................................4

*Moran v. London Recs., Ltd.*,
  827 F.2d 180 (7th Cir. 1987)..................................................................6

*Morris v. Young*,
  925 F. Supp. 2d 1078 (C.D. Cal. 2013)..................................................24

*Neman Bros. & Assocs., Inc. v. One Step Up Ltd.*,
  2019 WL 8129616 (C.D. Cal. Nov. 25, 2019)......................................9

*New Era Publications Int'l, ApS v. Henry Holt & Co.*,
  695 F. Supp. 1493 (S.D.N.Y. 1988)..................................................17

*O'Connell v. Celonis, Inc.*,
  2022 WL 3591061 (N.D. Cal. Aug. 22, 2022)......................................7

*Paramount Pictures Corp. v. Carol Pub. Grp.*,
  11 F. Supp. 2d 329 (S.D.N.Y. 1998)..................................................17

v

*Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*,
  181 F.3d 83 (2d Cir. 1999) ................................................................................17

*Parker v. Winwood*,
  2017 WL 6886076 (M.D. Tenn. Oct. 17, 2017) ..................................................6

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) ..........................................................................10

*Repp v. Webber*,
  892 F. Supp. 552 (S.D.N.Y. 1995) ...................................................................15

*Righthaven LLC v. Hoehn*,
  716 F.3d 1166 (9th Cir. 2013) .....................................................................4, 6, 7

*Russell v. Walmart Inc.*,
  2020 WL 5289889 (C.D. Cal. Aug. 17, 2020) ....................................................9

*Russell v. Walmart Inc.*,
  2020 WL 9073046 (C.D. Cal. Oct. 16, 2020) ......................................................2

*Seals-McClellan v. Dreamworks, Inc.*,
  120 F. App'x 3 (9th Cir. 2004) .........................................................................10

*Sedlik v. Drachenberg*,
  2022 WL 2784818 (C.D. Cal. May 31, 2022) ..............................................22, 24

*Seltzer v. Green Day, Inc.*,
  725 F.3d 1170 (9th Cir. 2013) ......................................................................17, 19

*Sierra Club v. Morton*,
  405 U.S. 727 (1972) ............................................................................................8

*Silvers v. Sony Pictures Ent., Inc.*,
  2001 WL 36127624 (C.D. Cal. Jan. 25, 2001) ...................................................7

*Silvers v. Sony Pictures Ent., Inc.*,
  402 F.3d 881 (9th Cir. 2005) ..............................................................................7

*Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) ....................................................................passim

*Skidmore v. Led Zeppelin*,
  2016 WL 1442461 (C.D. Cal. Apr. 8, 2016) .......................................................6

*Stabile v. Paul Smith Ltd.*,
  137 F. Supp. 3d 1173 (C.D. Cal. 2015) ............................................................10

*Stockfood Am., Inc. v. Adagio Teas, Inc.*,
  475 F. Supp. 3d 394 (D.N.J. 2020) .....................................................................4

*Straughter v. Raymond*,
  2011 WL 13176750 (C.D. Cal. Nov. 21, 2011) ...........................................15, 16

vi

*Straughter v. Raymond*,
  2011 WL 3651350 (C.D. Cal. Aug. 19, 2011) ............................................7, 15

*Swirsky v. Carey*,
  376 F.3d 841 (9th Cir. 2004) .....................................................................3

*Sybersound Recs., Inc. v. UAV Corp.*,
  517 F.3d 1137 (9th Cir. 2008) ...................................................................4

*TCA Television Corp. v. McCollum*,
  839 F.3d 168 (2d Cir. 2016) .....................................................................20

*Teespring, Inc. v. Puetz*,
  2017 WL 956633 (N.D. Cal. Mar. 13, 2017) .............................................11

*Three Boys Music Corp. v. Bolton*,
  212 F.3d 477 (9th Cir. 2000) .............................................................11, 16

*Threshold Media Corp. v. Relativity Media, LLC*,
  2013 WL 12331550 (C.D. Cal. Mar. 19, 2013) ........................................24

*Topolos v. Caldewey*,
  698 F.2d 991 (9th Cir. 1983) .....................................................................5

*Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*,
  2016 WL 9223889 (C.D. Cal. Dec. 22, 2016) ...........................................4

*Unicolors, Inc. v. Urban Outfitters, Inc.*,
  853 F.3d 980 (9th Cir. 2017) .....................................................................9

*Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.*,
  121 F.3d 1332 (9th Cir. 1997) ...................................................................2

*Walker v. Univ. Books, Inc.*,
  602 F.2d 859 (9th Cir. 1979) ...................................................................10

*Warren v. Fox Fam. Worldwide, Inc.*,
  328 F.3d 1136 (9th Cir. 2003) ...................................................................5

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
  227 F.3d 1110 (9th Cir. 2000) .................................................................24

*XPays, Inc. v. Internet Com. Grp., Inc.*,
  2008 WL 11336139 (C.D. Cal. Jan. 10, 2008) .........................................18

*Yount v. Acuff Rose-Opryland*,
  103 F.3d 830 (9th Cir. 1996) .....................................................................6

**Statutes**

17 U.S.C. § 106 ...........................................................................................18

17 U.S.C. § 107 ...........................................................................................24

17 U.S.C. § 501 .......................................................................................3, 5

vii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Other Authorities**

4 NIMMER ON COPYRIGHT ("NIMMER") § 13.05 (2022) ......................................20, 23

**Rules**

Fed. R. Civ. P. 56 ................................................................................................................2

U.S. Ct. of App. 9th Cir. Rule 36-3 ................................................................................10

viii

If one were to look up "last-ditch" in the dictionary, Defendants' latest attempt to keep this case from the jury should come up.[1]  Indeed, given that this is Defendants' **fourth** try to do so, their collective laments that Plaintiffs' claims are somehow "particularly baseless" (Mot. at 1:4-6) ring hollow.  This is especially so considering that Defendants have had most of the evidence they now dress up as their latest summary judgment grounds since this case was filed almost five years ago.  Indeed, as of five years ago, Defendants knew that: (1) each Plaintiff had a publishing contract that Defendants now use to attack standing; (2) Ms. Swift claims to be the sole author of the lyrics of the allegedly infringing work, *Shake It Off* ("*Shake*"), and when Plaintiffs' work, *Playas Gon' Play* ("*Playas*"), came out, she led a supposedly sheltered lifestyle in the middle of nowhere that exposed her to nothing else but country music—which Defendants now try to utilize to defeat access; and (3) they see *Shake* as substantially dissimilar to *Playas*, which they now claim makes the former sufficiently transformative to allow them to hide behind fair use.  Yet despite having all of this supposed evidence from the very beginning, Defendants made a purposeful choice to bifurcate the proceedings and try their hand at defeating substantial similarity first.  Since Defendants failed there, two of the same expert witnesses ended up being re-designated, which led to their largely repetitive reports and depositions—all to enable Defendants to repackage the same "no substantial similarity" facts into a "transformative use" argument and make another run at the endzone.  Suffice it to say that if Defendants' goal was to outspend Plaintiffs into submission, they failed at that, too.

As shown below, none of Defendants' last-ditch arguments sticks.  Plaintiffs'

---

[1]   All internal alterations, quotation marks, footnotes and citations herein are omitted, and all emphasis is added unless otherwise noted.  All "D-UF" references are to Defendants' Statement of Uncontroverted Facts and Plaintiffs' Response thereto as reflected in Plaintiffs' Statement of Genuine Dispute, filed herewith.  All "P-AUF" references are to Plaintiffs' Statement of Additional Uncontroverted Facts, submitted as part of Plaintiffs' Statement of Genuine Dispute.  All "D-Ex." references are to Defendants' exhibits, which are consequently numbered despite being submitted through different supporting declarations.  All "P-Ex." references are to Plaintiffs' exhibits, which adopt the same numbering system for the Court's convenience.  P-Exs. 22-23 are to the concurrently filed Declaration of Loren Yukio Kajikawa ("Kajikawa Decl."), P-Ex. 24 is to the concurrently filed Declaration of Nathan Butler, and P-Exs. 25-85 are to the concurrently filed Declaration of Gerard P. Fox.

publishing deals left their respective stakes in this litigation intact; moreover, to the extent there is any ambiguity on that issue, there are sufficient factual issues to reserve this question for the jury.  As to the "trivial" showing that the Ninth Circuit accepts on access, having referred to it as so "increasingly diluted in our digitally interconnected world" as to question its continued significance, Plaintiffs have introduced ample evidence to satisfy it.  Any lingering doubts, including credibility issues, are jury questions.  Finally, fair use is not a license to infringe where, as here, the chorus of one song merely repackages the heart of another to express the same message with the same commercial purpose.  In other words, this case is ready for trial.

## I.   <u>General Governing Principles</u>

This Court "applies *Anderson*, *Celotex*, and their Ninth Circuit progeny" in deciding a summary judgment motion.[2]  Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As such, in ruling on a motion for summary judgment, the Court's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact.  *See Anderson*, 477 U.S. at 249. The moving party bears the initial burden of identifying relevant portions of the record that demonstrate the absence of facts necessary for one or more essential elements of each claim upon which the moving party seeks judgment.  *See Celotex*, 477 U.S. at 323.  If the moving party meets its initial burden, the opposing party must then set out specific facts showing a genuine issue for trial in order to defeat the motion.  *See Anderson*, 477 U.S. at 250.  When deciding a motion for summary judgment, "the inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to the party opposing the motion."[3]  As Defendants' own authority confirms, "[s]ummary judgment is inappropriate if a reasonable

---

[2]     *Russell v. Walmart Inc.*, 2020 WL 9073046, at *7 (C.D. Cal. Oct. 16, 2020) (Fitzgerald, J.), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

[3]     *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Valley Nat'l Bank of Ariz. v. A.E. Rouse & Co.*, 121 F.3d 1332, 1335 (9th Cir. 1997).

juror, drawing all inferences in favor of the nonmoving party, could return a verdict in the nonmoving party's favor." *Hill v. Walmart Inc*., 32 F.4th 811, 816 (9th Cir. 2022).

The proponent of a copyright infringement claim must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."[4]

## II.   **Plaintiffs Have Standing**

Defendants contend that each Plaintiff lacks standing to bring the infringement claims pending at bar because each of them, separately from the other, entered into a publishing agreement, whereby each supposedly assigned a portion of his "copyright" to two different publishers (66-2/3% of Hall's copyright to Famous Music Corporation ("Famous Music"), and 50% of Butler's copyright to three companies collectively referred to as "Zomba") in exchange for a receipt of loyalties. (*See* Mot. at 8-13.) Defendants further argue that each publishing deal (including the contracts and attendant assignments) also transferred each Plaintiff's entire right to sue for any kind of copyright infringement. (*See id*.)[5] Contrary to Defendants' arguments, however, this showing does not add up to the asserted lack of standing.

As an initial matter, it is not entirely clear whether each Plaintiff, as the original co-owner of *Playas* and acting independently of the other, could validly transfer any exclusive rights so as to confer standing to sue on their respective assignees. It is undisputed that only holders of "exclusive right[s]" under the Copyright Act have standing to sue for copyright infringement. (Mot. at 9:1-4, citing 17 U.S.C. § 501(b).) Yet where any given work is a joint work of authorship, such as *Playas* here, there is binding precedent that warrants a finding

---

[4]   *Feist Publications, Inc. v. Rural Telephone Service Co. Inc*., 499 U.S. 340, 361 (1991); *see also Swirsky v. Carey*, 376 F.3d 841, 844 (9th Cir. 2004).

[5]   None of Defendants, other than possibly Defendant Sony Music Publishing (US) LLC ('Sony"), which Defendants assert is "formerly known as Sony/ATV Music Publishing LLC" (Dkt. No. 134-45 at 1:3-5), appears to be a party or a successor in interest to the publishing contracts and assignments at issue. Defendants cite no authorities allowing third parties to raise someone else's purported exclusive contractual right to sue to defeat standing. Furthermore, none of Defendants' facts actually asserts that Mr. Hall's publisher is a party to this case (*cf*. D-UF 324 (only stating that "Sony Music Publishing (US) LLC, formerly known as Sony/ATV Music Publishing LLC … acquired Famous Music")).

that "any songwriter agreements … to transfer an exclusive interest of a song that has more than one author grants only a nonexclusive license," thus precluding the transferee from obtaining standing to sue. *Elohim EPF USA, Inc. v. Total Music Connection, Inc*., 2015 WL 12655556, at \*15 (C.D. Cal. Oct. 1, 2015), citing *Sybersound Recs., Inc. v. UAV Corp*., 517 F.3d 1137, 1146 (9th Cir. 2008); *accord John Wiley & Sons, Inc. v. DRK Photo*, 998 F. Supp. 2d 262, 280 (S.D.N.Y. 2014) ("[A] copyright owner cannot, by contract or otherwise, grant a non-exclusive licensee the right to sue for copyright infringement."), *aff'd*, 882 F.3d 394 (2d Cir. 2018).[6]   This is especially so considering that the right to sue is not one of the exclusive rights enumerated in the Copyright Act and thus cannot be transferred without some other exclusive right. *See Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1169 (9th Cir. 2013) ("Absent from the list of exclusive rights is the right to sue for infringement."); *see also DRK Photo v. McGraw-Hill Glob. Educ. Holdings, LLC*, 870 F.3d 978, 985-88 (9th Cir. 2017) (finding the contracts at issue to be nothing but "invalid attempts to transfer the bare right to sue").[7]

   In any event, "when a composer assigns copyright title to a publisher in exchange for

---

[6]    The *Elohim* court specifically distinguished the Ninth Circuit's subsequent decision in *Corbello v. DeVito*, 777 F.3d 1058 (9th Cir. 2015), as having no effect on the continued validity of *Sybersound*.  Indeed, while the *Corbello* court's affirmed a joint owner's right to transfer his copyright rights without his co-owner's permission, it never addressed the transferee's resulting standing to sue (if any) but rather simply acknowledged the existence of *Sybersound*'s "standing limitation on copyright assignees and licensees" of joint owners acting independently of each other. *Elohim*, 2015 WL 12655556, at \*15, citing *Corbello*, 777 F.3d at 1066; *see also Elohim EPF USA, Inc. v. Total Music Connection, Inc*., 2015 WL 12655484, at \*7 & n.5 (C.D. Cal. Nov. 19, 2015) (distinguishing Defendants' authority in *Minden Pictures, Inc. v. John Wiley & Sons, Inc*., 795 F.3d 997 (9th Cir. 2015), as not dealing with "the issue as to whether a transfer from one of many co-authors confers an exclusive license," and further explaining that while "*Corbello* held that an original co-author does not need the permission of other co-authors to transfer his or her interest in the joint work," it "did not, as Plaintiffs contend, hold that the transferee obtained an exclusive license in the transferred work"), citing *Corbello*, 777 F.3d at 1064.

[7]    Indeed, the situation here is very much akin to *Sybersound*, which was summarized as "binding precedent" in *Tresona Multimedia, LLC v. Burbank High Sch. Vocal Music Ass'n*, 2016 WL 9223889, at \*3 (C.D. Cal. Dec. 22, 2016), *aff'd*, 953 F.3d 638 (9th Cir. 2020), as follows: "Sybersound was an assignee of TVT Music Publishing's 'copyrighted interests for purposes of karaoke use, and **also the exclusive assignee of the right to sue to enforce the assigned copyright interest**.  TVT itself was a co-owner of the nine songs at issue in the case. Thus, the Ninth Circuit held that 'as a co-owner of the copyright, TVT could not grant an exclusive right in the karaoke-use interest of the nine reference copyrights.'" *Cf. Stockfood Am., Inc. v. Adagio Teas, Inc*., 475 F. Supp. 3d 394, 408-09 (D.N.J. 2020) (analyzing Ninth Circuit precedent and explaining why "born" co-owners and their assignees warrant different treatment).

the payment of royalties, an equitable trust relationship is established between the two parties which gives standing to sue for infringement of *that copyright*." *Love v. The Mail on Sunday*, 2006 WL 4046180, at *10 (C.D. Cal. Aug. 15, 2006), citing *Cortner v. Israel*, 732 F.2d 267, 271 (2d Cir. 1984); *see also* 17 U.S.C. § 501 ("The legal or beneficial owner of an exclusive right under a copyright is entitled to institute an action for any infringement *of that particular right* ...."); *accord DRK Photo*, 870 F.3d at 988; *cf. Topolos v. Caldewey*, 698 F.2d 991, 994-95 (9th Cir. 1983) (plaintiff's "alleg[ation] that pursuant to his publishing contract Vintage Image took out and held in his behalf the copyright to works which he had co-authored ... establish[ed] him as beneficial owner of the copyright"). "A beneficial owner may bring an infringement action to protect his economic interest in the copyright from being diluted by a wrong-doer's infringement." *Fantasy, Inc. v. Fogerty*, 654 F. Supp. 1129, 1131 (N.D. Cal. 1987). There is no dispute that both Plaintiffs received royalties in exchange for the supposedly transferred portions of their respective copyrights. (P-AUF 48.) Thus, assuming the contracts at issue here validly transferred any exclusive rights, as they must in order to confer standing, and given that each Plaintiff only partially transferred his respective copyright, it means that having parted with that part of his "legal title," each Plaintiff retained standing to sue for infringement thereof as a beneficial owner for the transferred portion of his copyright. *See Broad. Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997) ("Beneficial ownership arises by virtue of section 501(b) for the purpose of enabling an author or composer to protect his economic interest in *a copyright that has been transferred*."). Thus, Defendants' assertion that Plaintiffs cannot qualify as beneficial owners because they retained a portion of their copyright and thus did not "part[] with legal title" (Mot. at 11:3-6 & 13:1-2) simply ignores that they did part with the title for the purportedly transferred portion of their respective rights.[8]

Defendants also argue that because the publishing contracts assigned all rights to sue,

---

[8]   Defendants' sole authority for this point, *Warren v. Fox Fam. Worldwide, Inc.*, 328 F.3d 1136 (9th Cir. 2003), deals with works-for-hire, where the transferor never had any copyright ownership to transfer in the first place. *See DRK Photo*, 870 F.3d at 988 (distinguishing *Warren* on this basis).

this must include the assignment of beneficial ownership as well.  (*See* Mot. at 11:6-15 & 13:3-6.)  Yet they cite no authority for this proposition.  Since the equitable trust relationship is imposed as a matter of law,[9] any attempt to contract around the Copyright Act and the judicial concepts developed thereunder would not stand.  *Cf. DRK Photo*, 870 F.3d at 987 (observing that the parties' contractual intent cannot trump the Copyright Act), citing *Righthaven LLC v. Hoehn*, 716 F.3d 1166, 1171 (9th Cir. 2013); *Yount v. Acuff Rose-Opryland*, 103 F.3d 830, 834 (9th Cir. 1996) (observing that by providing standing to sue to beneficial owners, Section 501 (b) of the Copyright Act "indicates … [Congressional] intent to allow every beneficial owner to protect his interests, just in case the legal owner is not doing so.  In other words, because an infringer may well injure those who have rights to royalties, standing has been conferred upon them.").[10]  This is confirmed by the contract in *Cotner*, which also provided that the "music … and all rights therein shall be [publisher]'s '***sole and exclusive*** property to do with as we [publisher] wish,'" yet the court still found that the assignor had beneficial standing to sue.  732 F.2d at 270; *see also Parker v. Winwood*, 2017 WL 6886076, at *1 & 8 (M.D. Tenn. Oct. 17, 2017) (plaintiff retained standing to sue as a beneficial owner, despite the publishing contract's provisions for transfer of his copyright and "all rights whatsoever nature thereunder existing"), *aff'd*, 938 F.3d 833 (6th Cir. 2019); *Mason v. Jamie Music Pub. Co.*, 658 F. Supp. 2d 571, 579-80 (S.D.N.Y. 2009) (plaintiff will retain her beneficial ownership upon completion of transfer despite assigning her copyright along with "all claims and causes of action arising from the Composition").  This is especially so considering that some courts have expressed doubts as to whether such assignments of

---

[9]    *See, e.g., Skidmore v. Led Zeppelin*, 2016 WL 1442461, at *7 (C.D. Cal. Apr. 8, 2016) (distinguishing "equitable" right to sue as a beneficial owner from a legal right).

[10]   Indeed, the concept of beneficial ownership appears tailor-made for Mr. Hall's situation, whose publishing rights now appear to be held by Ms. Swift's publisher, Sony. (*See, e.g.*, D-Ex. 136.)  Accordingly, Sony had a conflict of interest when choosing whose interests to protect—those of its biggest stars, Ms. Swift, or Mr. Hall.  *Cf. Moran v. London Recs., Ltd.*, 827 F.2d 180, 183 (7th Cir. 1987) ("[W]hen a copyright owner assigned title in exchange for the right to receive royalties from the copyright's exploitation, a fiduciary relationship arose between the parties.").  Regardless of whether Sony breached its fiduciary duties to Mr. Hall by choosing to side with Ms. Swift, the law still protects Mr. Hall by reserving his standing to sue as a beneficial owner should his assignee refuse to do so.

6

future claims would even be valid under the statute in the first place.  *See Silvers v. Sony Pictures Ent., Inc.*, 2001 WL 36127624, at \*2 (C.D. Cal. Jan. 25, 2001) ("The Court recognizes that policy concerns underlying the Copyright Act might militate against allowing a copyright holder to assign away *future* rights to sue for copyright infringement.") (original italics).

As for the percentage of the copyright that each Plaintiff expressly retained under each of their respective contracts, each Plaintiff thus necessarily retained his right to sue as the current owner of the non-transferred portion of his rights.  *See, e.g., Straughter v. Raymond*, 2011 WL 3651350, at \*7 (C.D. Cal. Aug. 19, 2011) ("[E]ven if plaintiff only owns a share of the 'Reasons' copyright, he still has standing to sue defendants for copyright infringement as a co-owner.").  Any argument that either Plaintiff here transferred any rights to sue as to the portion of the copyright that he retained amounts to nothing more than an invalid attempt to transfer "the bare right to sue" without the necessary support of a corresponding exclusive right.  *DRK Photo*, 870 F.3d at 985-88 (referring to the attempted "transfer [of] the bare right to sue" as "invalid"); *Righthaven*, 716 F.3d at 1169 ("[T]he assignment of the bare right to sue for infringement, without the transfer of an associated exclusive right, is impermissible."); *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 890 (9th Cir. 2005) (Defendants' own authority finding the assignment of the bare right to sue for infringement to be impermissible and holding that such an assignment does not confer standing to sue).[11]

Finally, Defendants also appear to suggest that by merely asking for permission to sue from their respective publishers after they filed this lawsuit, Plaintiffs are now somehow

---

[11]    Indeed, the contractual definition of "Compositions" to which Mr. Hall's publisher obtained the right to sue is consistent with this interpretation.  Mr. Hall's contract defines "Compositions" as corresponding to the transferred "66-2/3% … of the copyright ownership and [other rights] … that is attributable to" his "share" of all his works (D-Ex. 131 at ¶ 2(a)).  To the extent this definition is ambiguous, extrinsic evidence of actual intent may come in to clarify them.  *See O'Connell v. Celonis, Inc.*, 2022 WL 3591061, at \*13 (N.D. Cal. Aug. 22, 2022).  (*See also* D-Ex. 131 at ¶ 29 (Mr. Hall's publishing contract is governed by California law).)  While Defendants cite only evidence of what Mr. Hall understood at the time of contracting, they cite no corresponding evidence as to what he actually intended (or what his publisher intended, for that matter).  Mr. Hall, however, testified that it was never his intent for his co-publisher to obtain a right to sue for the non-transferred portion of the copyright. (P-AUF 45, citing P-Ex. 30 at 68:17-69:7.)

7

foreclosed from proceeding with their claims here. Yet Defendants cite no supporting authority for this contention—most likely because neither Plaintiff could be deemed to have admitted what is essentially a legal conclusion. *Cf. 29 Beekman Corp. v. Wansdown Properties Corp. N.V.*, 2021 WL 4481006, at *5 (S.D.N.Y. Sept. 29, 2021) ("A party's statement interpreting a contract cannot be a judicial admission because it constitutes a legal conclusion rather than a factual admission."). This is especially so given that the course of conduct at issue is entirely consistent with each Plaintiff believing that he did have a right to sue and merely asking for permission to do so out of abundance of caution. Indeed, since the course of conduct at issue was undertaken after Plaintiffs had asserted their rights by filing the underlying claims, it could not have induced any kind of reliance from Defendants—or affect Plaintiffs' standing as a matter of law, since it is measured "based on the facts that exist at the time of filing" (Mot. at 12:25-26). Moreover, despite receiving notice of this lawsuit almost five years ago (*see* D-Ex. 141), Butler's publisher has neither attempted to intervene in this action nor asserted claims against him for supposedly breaching any allegedly exclusive rights to sue under the contract (*see* P-AUF 46), thereby effectively abandoning any such rights.[12]

The bottom line is that as long a party maintains "a sufficient stake in an otherwise justiciable controversy," it has valid standing to sue. *Sierra Club v. Morton*, 405 U.S. 727, 731 (1972). Both Plaintiffs remain "co-owner[s]" of *Playas* (Mot. at 10:4 (confirming as much as to Hall)) and continue collecting accountings for *Playas*; thus, they maintain "a sufficient stake" to proceed here.

## III.   **Plaintiffs Can Establish Copying**

A copyright infringement claim requires no evidence of copying, be it actual or

---

[12]     Mr. Butler's publishing contract is governed by New York law. (D-Ex. 137 at ¶ 12.05(a).) Under New York law, "[c]ontractual rights may be waived if they are knowingly, voluntarily and intentionally abandoned." *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104 (N.Y. 2006). Such abandonment "may be established by … failure to act so as to evince an intent not to claim a purported advantage." *Id.* Importantly, this inquiry necessarily raises an issue of fact, thus further foreclosing summary judgment as to Mr. Butler. *See id.* ("[T]he existence of an intent to forgo … a right [for purposes of abandonment] is a question of fact.").

circumstantial, because it may be inferred as a matter of law. *See Russell v. Walmart Inc*., 2020 WL 5289889, at *7 (C.D. Cal. Aug. 17, 2020) (Fitzgerald, J.). As long as plaintiff shows "a 'striking similarity' between the works," no further showing is required. *Id.*, citing *Baxter v. MCA, Inc*., 812 F.2d 421, 423 (9th Cir. 1987). "A finding of striking similarity is appropriate" when: (1) "the works are virtually identical," or (2) "the works 'are so strikingly similar as to preclude the possibility of independent creation.'" *Russell*, 2020 WL 5289889, at *7, citing, *inter alia*, *Unicolors, Inc. v. Urban Outfitters, Inc*., 853 F.3d 980, 988 (9th Cir. 2017); *accord Malibu Textiles, Inc. v. Label Lane Int'l, Inc*., 922 F.3d 946, 952 (9th Cir. 2019) ("[I]f the similarities are 'striking' enough ... such similarities can be sufficient on their own to establish that the defendant must have had access to the plaintiff's work."). Moreover, as Defendants' own authority confirms, "[a] finding of such [striking] similarity may be based on the overlap of unprotectable as well as protectable elements." *Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1064 (9th Cir. 2020).

Indeed, "copying might be demonstrated, with no proof or weak proof of access, by showing that a single brief phrase, contained in both pieces, was so idiosyncratic in its treatment as to preclude coincidence. In such circumstances, stimulation by the same stimulus would not serve as a defense ...." *Heim v. Universal Pictures Co*., 154 F.2d 480, 488 (2d Cir. 1946). Here, Plaintiffs' expert witness opined that the four-part sequences at issue are "nearly identical" and use "striking[ly]" similar phraseology (P-Ex. 22 at ¶¶ 1, 4, 11-14 & 20 & 26 at 61:10-62:22); in fact, he recently reaffirmed his conclusions by opining that "[t]he use of similar phrases in *Shake It Off* is striking and functions in identical fashion" (P-Ex. 23 at ¶ 7). Indeed, the Court itself appeared to suggest that the obviously high level of similarity could hardly be denied when they are laid out "side by side." (P-Ex. 25 at 12:6-13).) Tellingly, and contrary to Defendants' contentions, this Court does not need an expert to tell it whether the works are strikingly similar. *See Neman Bros. & Assocs., Inc. v. One Step Up Ltd*., 2019 WL 8129616, at *9 (C.D. Cal. Nov. 25, 2019) ("[Defendant] argues that plaintiffs cannot establish that two works are strikingly similar without expert testimony. *Unicolors*, however, dispels that notion. There, the Ninth Circuit affirmed the district court's

9

determination on summary judgment that two floral fabric designs were strikingly similar even though the district court conducted the similarity analysis by reviewing two photographic exhibits attached to the plaintiff's summary judgment submissions without the benefit of expert analysis."). Indeed, since this is not a "music" case but rather a case concerned with *literary* works, Defendants' own authority supports this notion. *See Stabile v. Paul Smith Ltd*., 137 F. Supp. 3d 1173, 1188 (C.D. Cal. 2015) ("While expert testimony may be necessary to establish striking similarity in 'technical' areas such as music, in many cases, the trier of fact is equipped to make this determination without expert assistance."). In turn, Defendants' contention that Plaintiffs cannot establish striking similarity without any "evidence" that the accused work "*could not possibly* have been the result of independent creation" is questionable as a matter of law;[13] indeed, as Defendants' own authority shows, independent creation is an affirmative defense.[14] It is thus unsurprising that other courts rejected any notion that Plaintiffs must carry the burden touted by Defendants here.[15] Indeed,

---

[13] Defendants' authority for this proposition, *Stabile*, 137 F. Supp. 3d at 1188 (original italics), appears to improperly rest on the unpublished opinion in *Seals-McClellan v. Dreamworks, Inc*., 120 F. App'x 3 (9th Cir. 2004). *See* Ninth Circuit Rule 36-3(c) ("Unpublished dispositions and orders of this Court issued before January 1, 2007 may not be cited to the courts of this circuit …."). Regardless, the *Seals-McClennan* court's own source for this notion was the opinion in *Walker v. Univ. Books, Inc*., 602 F.2d 859, 864 (9th Cir. 1979), where the court expressly held that it "need not reach the issue of substantial similarity" and only noted in passing that "proof of actual copying … is often attained … where the similarity between the two works is such that no explanation other than copying is reasonably plausible," rather than that such a showing was required. Indeed, the *Stabile* court itself went on to confirm that "striking similarity simply means that in human experience it is virtually impossible that the two works could have been independently created." 137 F. Supp. 3d at 1188.

[14] *Rentmeester v. Nike, Inc*., 883 F.3d 1111, 1117 (9th Cir. 2018), *overruled on other grounds by Skidmore*, 952 F.3d 1051; *see also Arch Chemicals, Inc. v. Radiator Specialty Co*., 653 F. Supp. 2d 1099, 1104 (D. Or. 2009) ("[A] plaintiff need not disprove an affirmative defense in order to survive summary judgment."); *cf. Green v. Metro-Goldwyn-Mayer Studios Inc*., 2008 WL 11338272, at *4 (C.D. Cal. Nov. 24, 2008) (denying defendants' summary judgment motion because, *inter alia*, "independent creation is an affirmative defense to copyright infringement," and "the Court need not determine whether [the accused work] is an independent creation at this stage of the proceedings because Defendants did not move for summary judgment on this issue").

[15] *See Gray v. Perry*, 2018 WL 3954008, at *5 (C.D. Cal. Aug. 13, 2018) (denying summary judgment: "Defendants … argue that plaintiffs cannot rebut defendants' own testimony that they independently created [the accused song], and that therefore, plaintiffs' claim for copyright infringement fails. However, the Court observes that the strength of defendants' evidence concerning independent creation is a factual issue for the jury to determine at trial, and is not an issue suited for determination at this stage."), citing *Three*

courts have denied summary judgment with no evidence of access by simply comparing the works and concluding that their "striking similarity" means that "a reasonable jury could conclude … that [Defendant] copied [Plaintiff]'s design." *Teespring, Inc. v. Puetz*, 2017 WL 956633, at *2 (N.D. Cal. Mar. 13, 2017) (also observing that because the works were "strikingly similar," defendant's "evidence of independent creation is not strong enough" to preclude plaintiff from reaching a jury).[16]

In any event, Professor Kajikawa's conclusions that because the works at issue are "nearly identical" and use "striking[ly]" similar phraseology "in identical fashion," any notion of independent creation or simple coincidence is virtually impossible provide sufficient evidence to establish an inference of copying as a matter of law.  (Kajikawa Decl. ¶¶ 8-9.) Consequently, Defendants' assertion that copying is not even "*likely*" based on the supposed commonality of tautologies in general and playa/hater tautologies in particular (Mot. at 14:4-16 (original italics)) says nothing about the exact combination of such phrases and sequencing thereof in the four-part lyrical sequences at issue here.[17]

---

*Boys Music Corp. v. Bolton*, 212 F.3d 477, 486 (9th Cir. 2000), *overruled on other grounds by Skidmore*, 952 F.3d 1051.  It is, of course, immaterial that Defendants deny ever hearing Plaintiffs' song.  *See id.* at *5 n.5 (C.D. Cal. Aug. 13, 2018) ("The Court acknowledges that the 'Dark Horse' Writers claim that they had never heard 'Joyful Noise' before writing 'Dark Horse.'  The defendants in *Three Boys* also insisted that they had not heard the song that they had been accused of copying.  But even if defendants cannot remember hearing 'Joyful Noise,' the Ninth Circuit recognizes that copyright infringement of a popular song can be subconscious."), citing *Three Boys*, 212 F.3d at 483-4.

[16]    *See also Alpi Int'l, Ltd v. Anga Supply, LLC*, 118 F. Supp. 3d 1172, 1180 (N.D. Cal. 2015) (refusing to consider any of plaintiff's evidence on access yet still denying summary judgment: "[B]ecause all of the asserted and allegedly infringing works are so similar, the Court does not, at this time, exclude the possibility that a jury could find the works 'strikingly similar' and thus create a permissible inference of copying even without evidence of access."); *accord Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1111 (N.D. Cal. 2021) (on summary judgment, observing that "[w]here there is no evidence of access, the two works must be 'strikingly similar'" and "[d]emonstrating such similarity requires a side-by-side comparison" and finding that plaintiff established copying based on the court's own determination that the designs at issue were "identical"); *Haas Automation, Inc. v. Denny*, 2013 WL 6502876, at *8 (C.D. Cal. Dec. 4, 2013) (reaching substantially the same conclusions).

[17]    Defendants' apparent attempt to identify R. Kelly's song as the supposed prior common source fails for similar reasons.  *First*, Defendants rely on "Fact 65" (Mot. at 14:11), which appears to have nothing to do with the issue.  *Second*, as Plaintiffs' response to Fact 26 shows, not only there is lack of evidence in this case that R. Kelly released his song prior to Plaintiffs' work (and, in fact, Mr. Hall testified as to the circumstances supporting his belief that R. Kelly had heard the recording of Plaintiffs' work before he recorded his song (D-Ex. 145 at 147:10-

But even on a lesser showing of substantial similarity (on which, as the Court has already determined, Plaintiffs raised sufficient issues of disputed fact to proceed to the jury), all Plaintiffs need to show to establish an inference of copying is Defendants' access to their work—which, as the Ninth Circuit confirms, requires little showing nowadays because "access may be established by a trivial showing that the work is available on demand." *Skidmore*, 952 F.3d at 1068 (also observing that "the concept of 'access' is increasingly diluted in our digitally interconnected world" and questioning whether the very concept of "access still has meaning"); *cf. Braham v. Sony/ATV Music Publ'g*, 2015 WL 7074571, at *5 (C.D. Cal. Nov. 10, 2015) (on a motion to dismiss, confirming that "[i]n the internet age, alleging access is not terribly difficult …. Having furnished a YouTube link to his song, Braham has plausibly pled that Defendants had the opportunity to view his work."). Plaintiffs' work has been accessible on demand through, at the very least, YouTube, where it has been available since 2010. (P-AUF 73-74.) Moreover, any notion that Plaintiffs must somehow demonstrate "commercial success" of their song to make the necessary showing on access, as Defendants argue (Mot. at 15:24-25), has been undermined by the Ninth Circuit's recent holdings, which refuse to offer sliding-scale copyright protections that are dependent on commercial success. *Skidmore*, 952 F.3d at 1068 (observing that "nothing in copyright law suggests that a work deserves stronger legal protection simply because it is more popular or owned by better-funded rights holders").

In any event, even if "access still has meaning," and Plaintiffs had to show anything

---

20)), but R. Kelly's combination is also different because it, *inter alia*, involved only a three-part structure that used different sequencing and replaced each appearance of "gonna" with "wanna." *Cf. Lester v. U2 Ltd.*, 2009 WL 10673938, at *3 (C.D. Cal. Apr. 10, 2009) (denying summary judgment based on, *inter alia*, conclusion by plaintiff's expert that no prior song contained "the same combination" of elements). In the same vein, Ms. Swift's listening to Eric Church's song *The Outsiders* is not probative, since that song uses only the first part of the four-part sequence at issue; moreover, it uses it only once outside of the chorus. (*See* D-UF (Pl. Resp.) 255.) *Cf. Golden v. Michael Grecco Prods., Inc.*, 524 F. Supp. 3d 52, 66 (E.D.N.Y. 2021) ("[E]ven if Golden could prove that he had obtained the image from another infringing use, that would not be a defense to Golden's own subsequent infringement."); *see also Enter. Mgmt. Ltd., Inc. v. Construx Software Builders, Inc.*, 2021 WL 511111, at *6 (W.D. Wash. Feb. 11, 2021) ("[Defendant]'s incorrect assumption that [plaintiff]'s work was public domain because so many others had also copied it does not absolve him of infringement."), citing *DC Comics v. Towle*, 802 F.3d 1012, 1024 (9th Cir. 2015).

beyond their song's on-demand accessibility to survive summary judgment where, as here, the Court has already found sufficient factual issues to deny summary judgment on the issue of substantial similarity, Plaintiffs have introduced evidence to establish the required "reasonable possibility" that Ms. Swift "had the chance" to hear Plaintiffs' song and thus satisfy even the standard employed by Defendants' own authority. *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th Cir. 2009). Indeed, Plaintiffs' burden to withstand summary judgment by showing access under this standard "is not so high. All plaintiffs must do here is set out specific facts showing a genuine issue for trial as to whether there is a reasonable possibility that defendants had the chance to view the protected work." *Gray*, 2018 WL 3954008, at *4 (denying summary judgment),[18] citing *Anderson*, 477 U.S. at 250, and *Art Attacks*, 581 F.3d at 1143. Here, Plaintiffs' evidence shows that their work was released to the public as part of 3LW's self-titled debut album, which reached No. 29 on the Billboard 200 album chart and No. 19 on the Billboard Top R&B/Hip-Hop chart, as well as was certified platinum by the Recording Industry Association of America with over 1,000,000 units sold; moreover, Plaintiffs' song itself, which was released as a single in April 2001, reached No. 17 on the Billboard U.S. Rhythmic chart, No. 50 on the Billboard R&B/Hip-Hop Airplay chart, No. 56 on the Billboard U.S. Hot R&B/Hip-Hop Songs chart, No. 81 on the Billboard Hot 100 chart, No. 83 on the Eurochart Hot 100, No. 5 on the Billboard UK Hip Hop/R&B chart and No. 21 on the UK Singles chart; furthermore, it was performed on national television (on ABC's *Live with Regis and Kelly*) and debuted around March 7, 2001 at No. 7 on one of the most watched MTV shows at the time, which was *Total Request Live* countdown show, staying on the countdown for 11 days and peaking at number 5, as well as was one of the most played videos on MTV for the week of April 29, 2001. (*See* P-AUF 17-24, 49-72 & 75 (also detailing other evidence of widespread dissemination, including considerable radio play).) Additionally, in 2001, *Playas* was repeatedly one of the "Most

---

[18]   While the *Gray* court also rejected the proposition that online accessibility alone would suffice to produce an inference of access, this was prior to the Ninth Circuit's opinion in *Skidmore*, 952 F.3d at 1068, confirming the opposite.

1  Added" radio songs according to Radio & Records (R&R), a trade publication, which, in part,

2  monitored and reported airplay data supplied by Mediabase Research, a division of Premiere

3  Radio Networks and repeatedly appeared on the R&R/CHR Rhythmic Top 50 chart, climbing

4  to No. 20 on June 22, 2001. (*See* P-AUF 65.)  In fact, three months after its release, Plaintiffs'

5  song was selected for inclusion on "Now That's What I Call Music! 7," which debuted at No.

6  1 on the Billboard 200 chart, with 621,000 copies sold in its first week. (*See* P-AUF 55.)  Even

7  aside from its peak popularity, Plaintiffs' work was voted as one of Billboard's "Top 100

8  Greatest Girl Group Songs of All Time" in 2017, clearly signifying that it remained in the

9  collective consciousness long after it was released.  (*See* P-AUF 76.)  While Defendants deny

10  that this evidence is sufficient to show their exposure and attempt to distance themselves from

11  all the aforementioned sources, this factual issue cannot be properly resolved at this point.[19]

12      Indeed, none of Defendants' authorities even suggests that Plaintiffs' showing is

13  somehow insufficient to withstand summary judgment on access.[20]  By contrast, courts have

14

15  [19]      Thus, for example, Ms. Swift's self-described sheltered lifestyle at the time Plaintiffs'
   work was at its peak of popularity, along with her mother's evidence collaborating the same,
16  does not rule out Ms. Swift going shopping to a local supermarket or to the mall and catching
   Plaintiffs' work being played there—in fact, Ms. Swift's sworn testimony confirms her trips
17  to the mall around the relevant time. (*See* P-AUF 80.)  Indeed, there is evidence of Plaintiffs'
   licensing of *Playas* to the service that administers music for supermarkets and malls—or even
18  elevators.  (*See* P-AUF 75.)  There are also reports of Ms. Swift's remembering trips to New
   York during the same time, where she went on modeling auditions and took voice lessons.
19  (*See* P-AUF 82.)  Those trips could similarly expose Ms. Swift to the popular music of the
   time, including Plaintiffs' work.  In any event, Ms. Swift does admit that she went to school
20  every day during the relevant time, which certainly exposed her to other children playing
   popular music that likely included *Playas* given the above-described popularity of the song—
21  indeed, it was unlikely that Ms. Swift's classmates did not watch MTV or its flagship show,
   TRL, which was at its peak popularity in 2001.  (The Court can appropriately take judicial
22  notice     of     TRL's     popularity     at     the     time,     as     detailed     at
   https://en.wikipedia.org/wiki/Total_Request_Live.)  Similarly, while Mr. Sandberg describes
23  his supposed isolation from U.S. music in Sweden at the time (which appears to be
   contradicted by his statements to the press, as well as reports of his working out of New York
24  around the same time (D-UF (Pl. Resp.) 435)), and aside from *Playas*' popularity in Europe
   according to the above-cited charts (which specifically account for Sweden), he does admit
25  watching TRL when one of his U.S. recordings artists was featured, and one of such artists
   was Britney Spears, whose song appeared on TRL at the same time as *Playas*.  (*See* P-AUF
26  96; *see also* Declaration of Karl Martin Sandberg, Dkt. No. 134-6, at ¶¶ 6 & 9.)  In turn, the
   evidence of *Playas*' charting in Europe (including Sweden) and Mr. Schuster's admission that
27  that he did have access to American R&B/Hip Hop music at the time (although not to "rap,"
   which is irrelevant for *Playas*), creates issues of fact as to his access as well. (*See* Declaration
28  of Karl Johan Schuster, Dkt. No. 134-7, at ¶ 4.)
   [20]      Thus, Defendants rely on *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988,

14

denied summary judgment of access based on a similar showing. *See Straughter v. Raymond*, 2011 WL 13176750, at *3 (C.D. Cal. Nov. 21, 2011) (denying reconsideration of the court's prior denial of summary judgment and, in addition to taking judicial notice of the song's limited chart success, also observing that "[e]ven if [plaintiff's song] received limited radio airplay, a rational jury could still find that defendants had more than a 'bare possibility' of hearing the song"); *Straughter*, 2011 WL 3651350, at *8-13 (denying summary judgment on access based on a showing that included, *inter alia*, only limited chart success, such as only reaching "number 32 on the Billboard Chart which lists the most popular songs in R & B and hip hop only");[21] *Repp v. Webber*, 892 F. Supp. 552, 557 (S.D.N.Y. 1995) (where the song, *inter alia*, "hit[] the Billboard magazine charts of popular music for twelve weeks" and was reviewed by Variety magazine, denying summary judgment on access: "While this evidence, standing alone, by no means compels the conclusion that there was access ... it does not compel the conclusion that there was not.  Accordingly, … [the] contention that [claimants] cannot establish access to the copyrighted work is meritless."), citing *ABKCO*, 722 F.2d at 998.[22]  Indeed, the Ninth Circuit's decision in *Three Boys* affirmed the jury's finding of access

---

998 (2d Cir. 1983), an opinion dealing with access in the world before Ms. Swift was even born, and point out that there the song was a number one hit.  Aside from the fact that defendant in that case "admitted at trial" that he had heard the song, rendering further discussion of access in *ABKCO* as simply dicta, this certainly does not mean that if a song is **not** a number one hit, then no access could possibly be established.  Indeed, the Ninth Circuit's refusal to provide sliding-scale protections based on a given work's commercial success forecloses this line of argument.  *See Skidmore*, 952 F.3d at 1068.  Similarly, the court's resolving credibility issues after trial in *Intersong-USA v. CBS, Inc.*, 757 F. Supp. 274, 281-82 (S.D.N.Y. 1991) (concluding that radio play evidence provided "an insufficient basis to conclude that any of [defendants] heard the song" because "[e]ach of these defendants denies having heard [the song] prior to the commencement of this suit," and "[t]he Court has been given no reason to doubt the veracity of these representations"), has no application on summary judgment.

[21]     While the *Straughter* court also based its holding on defendants being steeped in the same genre at the time (as did the Ninth Circuit in *Three Boys*), it is undisputable that Ms. Swift certainly became equally steeped in the same genre as Plaintiffs' song by the time *Shake It Off* was written, as she was attempting to break away from the mold of a country artist.  (*See* P-AUF 86-94.)  As such, by the time she (allegedly) wrote the lyrics of *Shake It Off*, she had become well-familiar with much of the genre (*see id.*) and was likely exposed to one of its well-known compositions, such as *Playas*.  Indeed, Ms. Swift's displayed her knowledge of many popular songs in this genre, even though some of them came out prior to 2001.  (*See* P-Ex. 31 at 106:2-109:11.)

[22]     To the extent Defendants seek to imply some kind of market saturation requirement, they also themselves confirm that this kind of evidence only "may" show "reasonable

on an even lesser showing, as there "the alleged infringers never admitted hearing the purportedly infringed song, 'Love is a Wonderful Thing' by the Isley Brothers. That song never even made the Billboard top 100. Indeed, the 'Love is a Wonderful Thing' was never even released on an album or compact disc until a year after the alleged infringers wrote their song." *Straughter*, 2011 WL 13176750, at *3 n.4, citing *Three Boys*, 212 F. 3d at 484 (reasoning that it was "entirely plausible" that two Connecticut teenagers could subconsciously copy a song "that was played on the radio and television for a few weeks … twenty years [earlier]"); *see also id.* at 484-5 (emphasizing that the proper inquiry "is not whether Plaintiff has proven access by a preponderance of evidence, but whether *reasonable minds* could find that Defendants had a *reasonable opportunity* to have heard Plaintiff's song before they created their own song.") (original italics).

## IV.    Defendants' Use is Not Fair

"Fair-use analysis … is a Great Balancing Act" that "can be elusive to the point of approaching the metaphysics of the law, where the distinctions are ... very subtle and refined, and, sometimes, almost evanescent." *Dr. Seuss Enterprises, L.P. v. ComicMix LLC*, 983 F.3d 443, 451 (9th Cir. 2020).[23]  Given the subtlety of the "equitable" analysis to be performed, *id.*, courts often refuse to take the jury's place in weighing the applicable factors, especially where, as here, "numerous conflicting factual disputes" are involved. *See, e.g.*, *Furie v. Infowars, LLC*, 401 F. Supp. 3d 952, 972 & 976 (C.D. Cal. 2019) (Fitzgerald, J.) (also identifying the relevant factors as "(1) the purpose and character of the use, including whether such use is of a commercial nature …; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4)

---

possibility" of access (Mot. at 16:18) rather than that any such showing is actually required. *See Gray v. Perry*, 2018 WL 5095118, at *3-5 (C.D. Cal. Oct. 17, 2018) (rejecting any such requirements to withstand summary judgment on access).

[23]    It is noteworthy that Defendants conceded during appellate argument in this case that if someone wrote a song repeating just the first two lines of the four-part sequence at issue here (albeit with Defendants' added repetition of words), Defendants would assert a claim for infringement, thus implying they themselves would not find the use to be fair. *See* https://www.ca9.uscourts.gov/media/audio/?20191015/18-55426/, at 23.25-26.10.

the effect of the use upon the potential market for or value of the copyrighted work"). Here, as discussed below, even assuming that Defendants fulfilled their evidentiary burden on this affirmative defense, summary judgment should still be denied due to the "widely conflicting evidence on the fair use defense that requires the Court to weigh credibility and resolve factual disputes…. [T]hese factual disputes and credibility determination are more appropriately left to the jury rather than determined by the Court on summary judgment." *Id.* at 974. Finally, it is also important to bear in mind that "[t]he exception to copyright protection for fair use cannot be permitted to swallow the basic right." *New Era Publications Int'l, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1513 (S.D.N.Y. 1988), *aff'd*, 873 F.2d 576 (2d Cir. 1989); *see also Paramount Pictures Corp. v. Carol Pub. Grp.*, 11 F. Supp. 2d 329, 336 (S.D.N.Y. 1998) (rejecting fair use for a substantially similar work because employing the "fair use" exception to infringement in this context would "swallow the rule"), *aff'd sub nom. Paramount Pictures Corp. v. Carol Pub. Grp., Inc.*, 181 F.3d 83 (2d Cir. 1999).

On the first factor, where the infringing work's "basic purpose remains a commercial one—to sell … [work] for profit," and no transformative use is shown, such "commercial use of copyrighted material is presumptively an unfair exploitation of the monopoly privilege that belongs to the owner of the copyright." *Leadsinger, Inc. v. BMG Music Pub.*, 512 F.3d 522, 530 (9th Cir. 2008); *see also Frisby v. Sony Music Ent.*, 2021 WL 2325646, at *15 n.18 (C.D. Cal. Mar. 11, 2021) (observing that commercial use "is a separate factor that tends to weigh against a finding of fair use," which looks at whether defendant "stands to profit from exploitation of the copyrighted material without paying the customary price"), citing *Harper & Row Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539, 562 (1985). Defendants never deny that *Shake It Off* was purposefully a mega commercial success and was created with the unmistakable aim to make money. Rather, they attempt to portray their work as transformative and thus "[n]ot [p]rimarily [c]ommercial" (Mot. at 18-21). This argument is unavailing for at least three reasons. *First*, Defendants' own authority on this point, *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1176 (9th Cir. 2013), does not support the notion that one should measure the transformative value of the work and call it a day on the first factor.

Rather, the *Seltzer* court came to find commercial use there to qualify as incidental and thus carry little weight only because the accused work at issue was a short video used for background scenery during concerts.  *See id*. at 1178.[24]  As such, it was not used to make money—the concert goers were already there, they had already bought their tickets; in other words, the accused work in *Seltzer* was never actually used as any kind of a marketing tool.  By contrast, here Defendants used the four-part sequence at issue for the very purpose of ***selling*** their song—it was in Defendants' chorus, which is the very "heart" or the "hook" of any song.  *Copeland v. Bieber*, 789 F.3d 484, 493-94 (4th Cir. 2015) (collecting authorities); *see also Arista Recs. LLC v. Myxer Inc*., 2011 WL 11660773, at *43 (C.D. Cal. Apr. 1, 2011) (rejecting fair use on summary judgment where the accused work used the chorus that is the "heart" of Plaintiffs' works).  Indeed, as the Fourth Circuit observed, "a chorus hook is important not only aesthetically but also commercially, where it may be central to a song's economic success," since "the hook is 'what you're selling'"—in other words, it is "the foundation of commercial songwriting, particularly hit-single writing."  *Copeland*, 789 F.3d at 494; *cf. Elvis Presley Enterprises, Inc. v. Passport Video*, 349 F.3d 622, 628 (9th Cir. 2003) (finding that the use was more commercial and less transformative where defendant "seeks to profit at least in part from the inherent entertainment value" of the original work).

---

[24]    The line of authorities utilized in *Seltzer* to suggest that "transformative use" was outcome determinative has been since heavily criticized.  *See, e.g., Kienitz v. Sconnie Nation LLC*, 766 F.3d 756, 758 (7th Cir. 2014) (observing that the relevant Supreme Court precedent does not compel this approach and explaining that "[w]e're skeptical of [this] approach, because asking exclusively whether something is 'transformative' not only replaces the list in § 107 but also could override 17 U.S.C. § 106(2), which protects derivative works…. [This approach] do[es] no[t] explain how every 'transformative use' can be 'fair use' without extinguishing the author's rights under § 106(2).").  The Ninth Circuit's latest position on the issue appears to settle on viewing the analysis on a sliding scale: "[W]e consider whether the infringing work is transformative ***and*** whether it is commercial…. [T]he more transformative the new work, the less will be the significance of other factors, like commercialism." *McGucken v. Pub Ocean Ltd*., 42 F.4th 1149, 2022 WL 3051019, at *4 (9th Cir. 2022) ; *accord Furie*, 401 F. Supp. 3d at 972 ("First, courts ask whether the use of the work is commercial in nature.  Second, they ask whether such use is transformative.").  Accordingly, courts deny summary judgment on fair use even where defendants establish transformative use.  *See, e.g., XPays, Inc. v. Internet Com. Grp., Inc*., 2008 WL 11336139, at *9 (C.D. Cal. Jan. 10, 2008) (finding "a mixed transformative and commercial purpose" and concluding "that weighing this factor in favor of [defendant] is not the only conclusion that could be reached by a reasonable finder of fact").

*Second*, Defendants' use does not qualify as transformative as a matter of law.  In fact, other than one case dealing with a parody, Defendants do not even rely on any authority where one song's use of another song qualified as transformative use.  In any event, Defendants' own authority confirms that to qualify as "transformative," "[t]he use … must employ the quoted matter in a different manner or for a different purpose from the original.  A quotation of copyrighted material that merely repackages or republishes the original is unlikely to pass the test; in Justice Story's words, it would merely 'supersede the objects' of the original." *Seltzer*, 725 F.3d at 1176-77 (proceeding to find the use transformative based on the accused work using the original to communicate an entirely new message, since the original "clearly says nothing about religion," while the accused work portrayed "the hypocrisy of religion, surrounded by religious iconography").  Indeed, the Ninth Circuit specifically distinguished "the typical 'non-transformative' case, [where] the use is one which makes no alteration to the *expressive content or message* of the original work," *id.* (original italics), and that is exactly the case here.  As the evidence shows (and any reasonable listener can hear), both choruses convey "the same fundamental message" that "we should not be concerned with what other people say and do, trusting in ourselves instead" (P-Ex. 23 at ¶¶ 2 & 5 (observing that both songs feature the protagonist who is "confident, determined, resolute, and disdainful of the gossipers"), and P-Ex. 4 at ¶ 10; *see also* D-UF (Pl. Resp.) 89, 90 & 185; P-AUF 15; D-Ex. 6 at 22-23 (Defendants' expert agreeing that the two works exhibit a "general similarity in presenting a speaker who is considering negative comments made by others" and that "both works depict in a general way a world in which some people are critical"); P-Ex. 9 at 43:21-44:12 (Defendants' expert agreeing that both songs recount people speaking negatively about the protagonist).)  Ms. Swift confirmed as much herself through sworn testimony.  (*See* P-AUF 98, citing P-Exs. 31 at 92:5-93:22 & 113:11-19 & 33 (in Ms. Swift's own words, *Shake It Off* is "for any of us who … felt like we've been … gossiped about" and its message is that "[p]eople can say what they want about us, at any time … and we cannot control that.  The only thing we can control is our reaction to it.").)  In this connection, Defendants' shocking assertion that it is somehow "beyond dispute" in this case that the works are different in

19

"meaning and message" (Mot. at 19:8-10) is not only unsupported, it is directly contrary to the record developed in this case.[25]

Indeed, as Defendants' own authority confirms, "the addition of new expression to an existing work is not a get-out-of-jail-free card that renders the use of the original transformative." *Dr. Seuss*, 983 F.3d at 453; *see also* 4 NIMMER ON COPYRIGHT ("NIMMER") § 13.05[B][6] (2022) ("It would seem that the pendulum has swung too far in the direction of recognizing any alteration as transformative, such that this doctrine now threatens to swallow fair use.  It is respectfully submitted that a correction is needed in the law.").  In fact, Defendants' own summary of the holding in *Dr. Seuss* accurately describes the case at bar because, just like defendant in *Dr. Seuss*, Defendants here merely "replac[ed] original characters" and left the "story" and its building material "otherwise intact" (Mot. at 20:6-8) by merely replacing the soulful protagonist in *Playas* with the upbeat protagonist in *Shake It Off*—who, at the end of the day, both still proclaim that they will not pay attention to their critics and stay true to themselves by using the "strikingly" similar four-part lyrical sequence.  *See Dr. Seuss*, 983 F.3d at 455 ("Although [the accused] work need not boldly go where no one has gone before, its repackaging, copying, and lack of critique of [the original], coupled with its commercial use of [the original], do not result in a transformative use.  The first factor weighs definitively against fair use."); *TCA Television Corp. v. McCollum*, 839 F.3d 168, 182-83 (2d Cir. 2016) (finding accused work not transformative where the "only purpose served by the extent of defendants' taking is identically comedic to that of the original authors .... [T]here is 'nothing transformative' about using an original work 'in the manner it was made to be' used."); *cf. McGucken*, 42 F.4th 1149, 2022 WL 3051019, at *6 (rejecting the argument that placing plaintiffs' work into a different context amounts to transformative use because "it is hard to imagine what would *not* be a fair use, or what could not be readily turned into a fair use" under this theory) (original italics); *Blanch v. Koons*, 467 F.3d 244,

---

[25]   Defendants also mischaracterize Plaintiffs' claims as supposedly based on copying "the idea" of combining certain phrases. (Mot. at 19:5 & 22:3.)  Plaintiffs have already addressed this improper mischaracterization in their prior submissions. (*See also* D-UF (Pl. Resp.) 495.)

252 (2d Cir. 2006) (Defendants' own authority, where the court observed that it would be futile for defendant to argue that a painting is transformative of a photograph because "[w]e have declined to find a transformative use when the defendant has done no more than find a new way to exploit the creative virtues of the original work" and finding that the first factor weighed in defendant's favor only because plaintiff never contested that the works' purposes were different).   As such, Defendants' pronouncement that their work "is a highly transformative one" (Mot. at 20:14) rings hollow.   *See Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 41-43 (2d Cir. 2021) (concluding that "the bare assertion of a 'higher or different artistic use' is insufficient to render a work transformative" where "the overarching purpose and function of the two works at issue ... is identical"), *cert. granted*, 142 S. Ct. 1412 (2022).

*Third*, even if the differences between the songs identified by Defendants could amount to transformative use,[26] Plaintiffs have raised sufficient factual issues on this point to withstand summary judgment, especially based on the above-collected evidence that the core message of the works is essentially the same.   Notably, all the identified differences, such as the asserted romantic mood of *Playas* and the upbeat nature of *Shake It Off,* have been discounted by Plaintiffs' expert witness as insufficient to differentiate the songs' shared "thematic centers" (P-Ex. 23 at ¶¶ 6-10 (discounting the romantic nature of *Playas* because "both songs are about speakers who demonstrate resolve in the face of a hostile world,"

---

[26]   These are essentially the same differences that this Court rejected as insufficient to warrant summary judgment on substantial similarity. (*See also* D-UF (Pl. Resp.) 125, 128, 130, 133 & 219; P-Ex. 4 at ¶¶ 47 & 50-52, P-Ex. 7 at 227:15-22.)   Thus, for example, as Plaintiffs already showed, there is nothing transformative about such functional decisions as repeating lyrics, since they merely drive the upbeat tempo of Defendants' song, as Defendants' own expert witness confirmed. (*See* P-AUF 31, citing Declaration of Professor Nathaniel Lewis (Dkt. No. 92-9) at ¶ 32 (observing that the repetition "provides [Defendants' work with its] … dynamism, mood and pace").)   *Cf. ABS Ent., Inc. v. CBS Corp.*, 908 F.3d 405, 418 (9th Cir. 2018) (observing that "functionally driven decision-making does not demonstrate the kind of originality with which copyright is exclusively concerned").   In fact, one of Defendants' own authorities observed that repetition (even with other changes) may prove insufficient to establish transformative use.   *See Cariou v. Prince*, 714 F.3d 694, 711 (2d Cir. 2013) (noting that although, *inter alia*, "repetition of the images … unarguably change[s] the tenor of the piece, it is unclear whether these alterations amount to a sufficient transformation of the original work of art such that the new work is transformative").

explaining that Defendants' word repetition is just a performative choice that is "not essential to the song's meaning or poetic effect" and opining that "none of the differences in mood or pace … overshadow" the essential repackaging of Plaintiffs' work by Defendants)). Indeed, according to Plaintiffs' expert witness, none of these differences could amount to the kind of use that courts find to qualify as transformative. (*See* Kajikawa Decl. at ¶ 11.) *See also Frisby*, 2021 WL 2325646, at *17 (rejecting song sampling as transformative because defendants' changes utilized "commonplace" practices and "do not appear to be particularly novel or unique").[27] Even if Defendants' expert disagrees on this point,[28] this only means that the issue should go to trial. *See also Brophy v. Almanzar*, 2020 WL 8175605, at *3 (C.D. Cal. Dec. 4, 2020) (denying summary judgment on fair use where there was an issue of fact as to defendants' supposedly transformative use of plaintiff's work and "a reasonable jury could conclude" that the use was not transformative, even though defendants did make "some changes" to the original), citing, *inter alia*, *Hilton v. Hallmark Cards*, 599 F.3d 894, 911 (9th Cir. 2010) (concluding there was "enough doubt as to whether Hallmark's card is transformative" so as to preclude the defense as a matter of law where there were "some differences" between the works but the basic message was the same); *see also Sedlik v. Drachenberg*, 2022 WL 2784818, at *9 (C.D. Cal. May 31, 2022) (denying summary judgment and finding that the first factor could not be determined as a matter of law where, *inter alia*, plaintiff introduced evidence that the accused work's changes were merely

---

[27] It is notable that Defendants' expert refers to other famous repetitions in literature, thus arguably rendering them similarly commonplace. (*See* P-AUF 99.) Regardless, since the Court has already found factual issues on the issue of substantial similarity, that must mean that whether Defendants' additions were "novel and unique" is a similarly factual question. Indeed, it is notable that Defendants' expert offered no separate opinions on the claimed transformative use; rather, Defendants rely on his opinions rendered to contest substantial similarity. (*See* Mot. at 19-20, citing, *inter alia*, D-UF 454-55, 457, 462-3, 467-8, 477-9, 480 & 482; P-Ex. 28 at 26:11-15 (Pr. Lewis confirming that he has not offered any new opinions since his original report dealing with substantial similarity).) If those opinions did not suffice to support summary judgment on the issue of whether the changes in Defendants' song were so original that they defeated substantial similarity, it thus follows that the same changes cannot qualify as sufficiently "novel and unique" for the claimed transformative use either.

[28] Pr. Lewis is a literary expert; accordingly, he offered no opinions to the extent Defendants claim transformative use of a selection and arrangement, let alone a selection and arrangement in a song. (*See* P-AUF 100.)

functional, especially when weighed together with the commercial nature of the accused work); *accord Furie*, 401 F. Supp. 3d at 974 ("[T]he Court concludes that, at minimum, there are disputed issues of fact precluding summary judgment as to whether the [use] … was physically and contextually transformative. The parties have presented widely conflicting evidence on the fair use defense that requires the Court to weigh credibility and resolve factual disputes…. [T]hese factual disputes and credibility determination are more appropriately left to the jury rather than determined by the Court on summary judgment.").

As for the remaining fair use factors, Defendants' analysis appears to be largely driven by their unsupported conclusion that their work is "highly transformative" (Mot. at 21:18 & 23:13 (second and fourth factors); *see also id*. at 22 (citing "transformative purpose" for the third factor)) and thus cannot hold up if the Court finds that the first factor weighs against them. In any event, the fact that *Playas* is admittedly a "creative musical work" (Mot. at 21:11) weighs against fair use on the second factor,[29] as does the Court's prior denial of summary judgment on substantial similarity in relation to the third factor[30]—indeed, none of

---

[29]   *BMG Rts. Mgmt. (US) LLC v. Glob. Eagle Ent. Inc.*, 2019 WL 6315533, at *9 (C.D. Cal. Sept. 9, 2019) (granting summary judgment against fair use and finding, *inter alia*, that "the nature of the copyrighted work [factor] undoubtably favors BMG because musical compositions and sound recordings are 'creative in nature and at the core of copyright's protective purpose"), citing *Leadsinger*, 512 F.3d at 530; *see also id.* at 531 ("Original song lyrics are a work of creative expression, … which is precisely the sort of expression that the copyright law aims to protect."); *accord Frisby*, 2021 WL 2325646, at *15 (finding against fair use on the second factor: "[A] creative song measures high under this second factor."), citing NIMMER at § 13.05[A][2][a]. Defendants' argument that Plaintiffs controlled the first appearance of *Playas* (*see* Mot. at 21:12-15) relies on cases dealing with unpublished works, which considered whether their unpublished nature should weigh against fair use. It is in that context that plaintiff's control of the first appearance mattered—if a work was unpublished yet plaintiff still controlled its first appearance, then the work's unpublished nature offered little weight. *Cf. Harper*, 471 U.S. at 564 (explaining that the scope of fair use is narrower for unpublished works **because** "the author's right to control the first public appearance of his expression weighs against such use of the work before its release"). This does not mean that the second factor weighs in favor of fair use every time the original is a published work, and none of Defendants' authorities appears to go that far.

[30]   *See Fournier v. Erickson*, 242 F. Supp. 2d 318, 336 (S.D.N.Y. 2003). In any event, taking the "heart" of the original, as Defendants did here, always weighs against fair use—even if the taking could be viewed as modest in quantity, as it is the qualitative aspects that drive the analysis. *See Harper*, 471 U.S. at 564-65 (finding that appellate court erred by overruling the district court's determination that the third factor weighed against fair use because defendant "took what was essentially the heart of the book"); *Frisby*, 2021 WL 2325646, at *16 (focusing on the "qualitative aspects" of the copied expression as "more significant as it has been held that copying a relatively small portion of the composition could

Defendants' authorities counsels otherwise.[31]   As for the fourth factor, "it is well accepted that when the intended use is for commercial gain, the likelihood of market harm may be presumed." *Leadsinger*, 512 F.3d at 531 (observing that "[w]e have not hesitated to apply this presumption in the past"); *see also Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 861 (9th Cir. 2017) ("Because the district court concluded that VidAngel's use was commercial and not transformative, it was not error to presume likely market harm.").  But even if this presumption does not apply, the focus of this inquiry is on ***potential*** market rather than actual harm.  *Cf. Worldwide Church of God v. Philadelphia Church of God, Inc*., 227 F.3d 1110, 1119 (9th Cir. 2000) ("If evidence of actual or potential monetary loss were required, copyrights held by nonprofits would be essentially worthless.").  Here, Defendants essentially conclude that their use could not deny Plaintiffs a licensing fee (and thus impact the market for derivative works) because Defendants' use was fair.  (*See* Mot. at 23:23-27.)

---

still bar the application of fair use if the part taken was particularly expressive or essential to the copyrighted work" and finding against fair use because the copied portion was the "important part[]" of the original); *Morris v. Young*, 925 F. Supp. 2d 1078, 1087 (C.D. Cal. 2013) ("The taking of the 'heart' of the work generally weighs against a finding of fair use."). Furthermore, as Plaintiffs already showed, Defendants copied the substantial majority of the creative choices that make up the "heart" of Plaintiffs' song, thus further weighing against fair use.  *See Sedlik*, 2022 WL 2784818, at *9-10 (weighing the third factor against fair use where defendants "copied numerous elements" from the original work, which was not necessary to create the sentiment that the accused work sought to create); *cf. Kienitz*, 766 F.3d at 759 ("There's no good reason why defendants should be allowed to appropriate someone else's copyrighted efforts …, when so many noncopyrighted alternatives ... were available. The fair-use privilege under § 107 is not designed to protect lazy appropriators.").

[31]    In *Fisher v. Dees*, 794 F.2d 432, 434 (9th Cir. 1986), taking the "heart" of the original mattered less because the accused work was a parody, and "[t]o 'conjure up' the original work in the audience's mind, the parodist must appropriate a substantial enough portion of it to evoke recognition."  *Id.* at 435 n.2; *see also Henley v. DeVore*, 733 F. Supp. 2d 1144, 1160 (C.D. Cal. 2010) ("A parodist is generally permitted greater license to borrow when parodying music: 'Like a speech, a song is difficult to parody effectively without exact or near-exact copying....  This 'special need for accuracy,' provides some license for 'closer' parody."), citing *Fisher*, 794 F.2d at 439; *see also Gaylord v. United States*, 595 F.3d 1364, 1373-74 (Fed. Cir. 2010) (distinguishing another Defendants' authority, *Lennon v. Premise Media Corp*., 556 F. Supp. 2d 310 (S.D.N.Y. 2008), as involving a critique of the original).  In turn, Defendants' reliance on *Threshold Media Corp. v. Relativity Media, LLC*, 2013 WL 12331550 (C.D. Cal. Mar. 19, 2013), is distinguishable because although the accused work did momentarily borrow the chorus there, the focus of the accused work was elsewhere.  *See id*. at *12.  By contrast, here Defendants took the heart of Plaintiffs' song and centralized their song around it.  Defendants' argument that this lyrical "heart" is not important relies on cases finding that the original work deserved no copyright protection (see Mot. at 22:11-18)—a proposition that is contrary to the law of the case here.  (*See also* Pl. MSJ Opp'n (Dkt. No. 98) at 17-19 (collecting authorities establishing that lyrics are separately protected).)

This entirely circular reasoning cannot hold up;[32] indeed, Defendants' use in itself demonstrates market harm: "Defendant argues that Plaintiffs have failed to allege a lost sale or licensing opportunity as a result of the use.  But Plaintiffs lost the opportunity to license the works to *Defendant*."  *Incredible Features, Inc. v. Backchina, LLC*, 2021 WL 6337194, at \*5 (C.D. Cal. Dec. 16, 2021) (reasoning that the fourth factor "assesses the losses [plaintiffs] *would* suffer if Defendant's use was sanctioned and repeated on a larger scale. The factor thus weighs heavily against fair use.") (original italics); *accord De Fontbrune v. Wofsy*, 39 F.4th 1214, 1226 (9th Cir. 2022) (observing that the fourth factor looks at "whether unrestricted and widespread conduct of the sort engaged in by the defendant ***would*** result in a substantially adverse impact on the potential market for the original" and rejecting defendant's evidence that the accused work "has not depressed the market for the [original]" because "it proves nothing about the effect on the market ….  The record supplies no evidence that widespread appropriation of [the original works] … would only negligibly affect the market ….").  As such, Defendants' no-harm-no-foul argument adds nothing to the analysis.

Accordingly, Defendants' motion should be denied in its entirety.

---

[32]   Indeed, Defendants' quote from *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 117 (2d Cir. 1998), omits a crucial detail—namely, that the court there simply could not envision a derivative market for ***parodies***.  By contrast, there is a thriving derivative market for sampling, which would be more akin to Defendants' use than a parody. *See, e.g.*, *Frisby*, 2021 WL 2325646, at \*16.  As such, if Defendants' use became widespread, the potential market for derivative works based on *Playas* would be severely undercut (*see* P-AUF 101). *Cf. Grant v. Trump*, 563 F. Supp. 3d 278, 289 (S.D.N.Y. 2021) (finding that the accused work "may threaten Grant's licensing markets" because "[i]t is plain that widespread, uncompensated use of Grant's music in promotional videos … would embolden would-be infringers and undermine Grant's ability to obtain compensation in exchange for licensing his music").  This is especially so considering that, as discussed, the works' purposes here are the same, which is unlike Defendants' authority in *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 614-15 (2d Cir. 2006), where the court found the market to be "transformative" based on the use of images in a biography. *Cf. Elvis Presley*, 349 F.3d at 631 (observing that the first and fourth factors are often interdependent because "[t]he more transformative the new work, the less likely the new work's use of copyrighted materials will affect the market for the materials"); *see also Disney Enterprises, Inc. v. VidAngel, Inc.*, 371 F. Supp. 3d 708, 722 (C.D. Cal. 2019) (market harm less important where the other three factors weigh against fair use).  Notably, the court in *Bill Graham* never actually analyzed "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original," which is the "central aspect of market harm" in this Circuit. *Dr. Seuss*, 983 F.3d at 461.

DATED: August 29, 2022          BY:   GERARD FOX LAW P.C.

*/s/ Gerard P. Fox*

Gerard P. Fox
Marina V. Bogorad
Olga Viner

*Attorneys for Plaintiffs*
SEAN HALL D.B.A. GIMME SOME
HOT SAUCE MUSIC and NATHAN
BUTLER D.B.A. FAITH FORCE MUSIC