# EXHIBIT 1

# EXPERT WITNESS REPORT OF BOB KOHN

## I.  EXPERT'S BACKGROUND

I have worked in the music industry both as a transactional attorney for music industry clients and as an executive operating several music industry companies, including an online music service provider and a provider of licensing and support services for major and independent record labels and music publishers. My expertise includes business practices within the music publishing, recording and entertainment industries, particularly with respect to the licensing of rights in musical compositions and sound recordings, the drafting of licensing agreements for musical works and sound recordings, and the customs and practices regarding such licensing agreements and transactions.

I am the author of *Kohn on Music Licensing, 5th Edition* (Wolters Kluwer, 2019), an 1800-page treatise on the customs and practices and various forms of agreements used in the music industry. Among other things, *Kohn on Music Licensing* addresses various types of publishing and recording agreements both domestically and internationally, and many of the standard forms of music rights and licenses associated with such rights.

The treatise also addresses the customs and practices of co-ownership of songs and the use of copyrighted material from one song in another song, such as where portions of a recording and its underlying song are "sampled" and used in another recording and its underlying song.

*Kohn On Music Licensing* was cited by the U.S. Supreme Court in *Eldred v. Ashcroft*, 537 U.S. 186, fn. 21 (2003) for music-industry business practices concerning the assignment of copyrights. It also was quoted at length in in *Bridgeport Music v. Dimension Films*, 410 F.3d 792, fn. 18 (6th Cir. 2005), concerning the use of digital samples of existing sound recordings in new sound recordings. In *Woods v. Bourne Co.*, 60 F.3d 978 (2d Cir. 1995) and *Boosey &*

**EXHIBIT 115**
Kohn 8.4.22

*Hawkes Music Publishers, Ltd. v. Buena Vista Home Video*, 145 F.3rd 481 (2d Cir. 1988), the book was cited for entertainment industry customs and practices concerning performance rights administered by ASCAP.

Upon graduating from Loyola Law School, Los Angeles in 1981, I became an associate attorney for the Law Offices of Milton A. "Mickey" Rudin, who represented, among others, Frank Sinatra, Liza Minelli, Cher, Steely Dan, Irvin Azoff's Frontline Management, Warner Bros. Music, Warner Bros. Publications, 20th Century Fox Studios, and other entertainment industry clients. I also served as an Associate Editor of the Entertainment Law Reporter.

Later, I co-founded eMusic.com., Inc. (NASDAQ:EMUS), a digital music service provider acquired by Universal/Vivendi in 2001, and in 2006 I co-founded RoyaltyShare, Inc., a provider of licensing, revenue and royalty processing services that assisted record companies with licensing recordings to digital music service providers and with calculating their royalty obligations to recording artists, record producers, and music publishers. We also developed and provided software to music publishers to assist them in processing their royalty obligations to songwriters and other music publishers.

Some of the cases in which I have provided testimony over the years include the following:

In 2007, I testified before late Judge William C. Conner, Sr. on behalf of ASCAP to inform the court on how musical works and sound recordings are used on the Internet, including their use on services such as AOL, RealNetworks, and Yahoo! *United States v. ASCAP in the Matter of America Online, Inc., RealNetworks, Inc., and Yahoo!, Inc.*, 559 F.Supp.2d 332 (2008).

In 2015, on behalf of the recording artist known as Jay-Z, I provided expert witness testimony on the language and purpose of several music license agreements in light of music

industry practices. *Fahmy v. Jay-Z (aka, Shawn Carter), et. al.*, Case No. 2:07-cv-05715-CAS (April 28, 2015).

In 2017, on behalf of recording artist Katy Perry, I provided a federal court with an expert report on industry customs and practices concerning the scope of live concert public performances licenses granted by ASCAP. *Gray v. Perry,* Case No. 2:15-cv-05642-CAS-JCx, 2017 U.S. LEXIS 50803 at 5, Dkt# 246 (Apr. 3, 2017).

In 2018, I testified as an expert on the interpretation of the terms of an exclusive recording agreement between the recording artist known as "50 Cent" and Universal Music Group, as well as industry practices concerning the use of the name, voice, and likeness of a recording artist in connection with the marketing and distribution of sound recordings of other artists. *Curtis James Jackson, III (p/k/a/ "50 Cent" v. William Leonard Roberts, II (p/k/a/ "Rick Ross")*, Case No. 3:17-cv-00550-WWE (D. Conn.).

In 2019, I testified as an expert on the business practices concerning the licensing of musical works for reproduction and digital transmission by online music service providers. *Bluewater Music Services Corp., et. al. v. Spotify USA, Inc.*, Case No. 3:17-cv-01051 (Mid. Dist. Tenn.).

I am the co-inventor of the patent for a means of tracking revenues and producing royalty statements arising from the exploitation of musical works and sound recordings. *Web-based Royalty System and User Interface*, Patent No. US 8,712825 (April 29, 2014).

## II. EXPERT ASSIGNMENT

I have been retained in this matter, as an expert on business customs and practices in the music industry, to supplement the record with my opinion regarding what portion of the profits from song *Shake It Off* are attributable to that song's use of lyrics from the song *Playas Gon' Play*.

In doing so, I am humbled by the observation of Judge Learned Hand when he recognized that, in these matters of attribution, "no real standard emerges."[1] While, on the one hand, the courts "are resolved to avoid the one certainly unjust course of giving the plaintiffs everything," on the other, "the defendants must be content to accept much of the embarrassment resulting from mingling plaintiffs' property with their own." *Id*. In either case, he continued, the courts "will not accept the experts' testimony at face value; we must make an award which by no possibility shall be too small." *Id*. While this expert does not expect his testimony to be taken at face value, his hope is that it may be taken at some value.[2]

### III. SUMMARY OF OPINIONS EXPRESSED

Plaintiff's unique combination of the words "player" (transformed by the songwriters to "playas") and "play," together with the words "hater" and "hate," and use of "gonna" (for "going to") into an original phrase—"Playas, they gonna play / And haters, they gonna hate"—is what appears to have struck the listeners ear most, drawing them to appreciate and enjoy the song *Playas Gon' Play*. It formed the heart of the song, a unique expression, in my view, which gave the song *Playas Gon' Play* its popular appeal and commercial success.

For the reasons set forth below, the portion of the profits from *Shake It Off* attributable to infringement of the *Playas Gon' Play*, in my view, may be reasonably set by the Court at 50%.

---

[1] *Sheldon v. Metro-Goldwyn-Mayer Pictures Corp.*, 106 F.2d 45, 51 (1939).
[2] Courts have since echoed Judge Hand's observation: "this is not an area susceptible to precise measurement." *ABKCO Music, Inc. v. Harrisongs Music, Ltd..* 508 F.Supp. 798, 801 (S.D.N.Y. 1981), modified, 722 F.2d 988 (2d Cir. 1983); *Gaste v. Kaiserman*, 863 F.2d 1061, 1069 (2d Cir. 1988).

## IV. FACTS CONSIDERED, OPINIONS EXPRESSED HEREIN, AND THE BASIS AND REASONS FOR THEM

**A. This case concerns the lyrics, as Plaintiff does not allege any copying of the purely musical elements.**

Plaintiffs do not claim copying of any of the musical elements of *Playas Gon' Play*, only the infringement of their copyrighted lyrics, but this allocation takes into consideration the importance of the lyrics in relation to the musical elements of the works and other factors.

**B. The original and unique phrase taken from the song *Playas Gon' Play* and used in *Shake It Off* is the heart of *Playas Gon' Play* and is what gave *Playas Gon' Play* its popular appeal and commercial success.**

Whether the original lyrical phrase at issue from the song *Playas Gon' Play* is a qualitatively substantial part of that song, used in the song *Shake It Off*, is a conclusion for the Court, not an expert, to determine. Yet, in making that determination, it may be helpful to consider that, while many of the facts in this matter remain in dispute, it appears the key facts that would guide one in an apportionment analysis remains undisputed: Plaintiff's unique combination of the words "player" (transformed by the songwriters to "playas") and "play," together with the words "hater" and "hate," into an original phrase—"Playas, they gonna play / And haters, they gonna hate"—is what appears to have struck the listener's ear most, drawing them to appreciate and enjoy the song *Playas Gon' Play*.

This unique, original expression, in my view, is what gave the song *Playas Gon' Play* its popular appeal and commercial success. In other words, "Playas, they gonna play / And haters, they gonna hate" became the whole meritorious part of the song *Playas Gon' Play*. The balance of the lyrics do not approach having the driving impact that this unique phrase has upon the listener.

**C.     That the phrase is the heart of the song *Playas Gon' Play* is supported by its use in the chorus and repeated use throughout the lyric.**

This view is supported by the undisputed fact that the phrase "Playas, they gonna play / And haters, they gonna hate" appears in the chorus of the song and is performed repeatedly. The chorus of a song is often, as is the case here, the *heart* of the song. Because of its brevity, repetitiveness, and frequent placement at the end of the song, the chorus tends to be the most memorable part of the song and, for that reason, often becomes the most popular and valuable part of the song.

I respectfully submit that the heart of the song *Playas Gon' Play* was the original and unique phrase, "Playas, they gonna play / And haters, they gonna hate."

**D.     That the phrase is the heart of the song is supported by its use in the song's title.**

The importance of the phrase in relation to the rest of the song *Playas Gon' Play* is reflected in its use of an abbreviated version of the phrase in the title of the song itself: "*Playas Gon' Play.*"

**E.     The brevity of the phrase taken has little bearing on attribution of profits.**

The brevity of the phrase taken has little bearing on what rises to the level of infringement and in attributing profits from its infringing use. In the late 1970's, the City of New York commissioned a commercial jingle comprising 60-seconds of music comprising 45 words of lyrics and 100 measures of music. Of this, only 4-notes and the words "I Love" were taken. The court held that the 4-second phrase repeated three times in defendant's song constituted a use of "the heart" of the commercial jingle and was sufficient to rise to the level of copyright infringement.[3]

---

[3] *Elsmere Music, Inc. v. National Broadcasting Company, Inc.,* 482 F.Supp. 741 (S.D.N.Y. 1980), aff'd 623 F. 2d 252 (1980) (The court proceeded to hold that, though the use of the 4-note phrase constituted copyright infringement, it's use in a parody of the original song was a permissible fair use of the copyright).

As I opined in my treatise, "while copyright does not protect words or short phrases that are frequently used by songwriters, such as 'ooh ooh ooh,' the addition of a few distinctive words *in a particular arrangement*, such as 'ooh ooh ooh . . . move . . . free your body', may warrant protection."[4] Likewise, here, while the words "player" and "hater" may be frequently used by songwriters, it is the few distinctive words—modified creatively (e.g., "players" to "playas," "going to" to "gonna") in the particular and unique arrangement created by Plaintiffs —"Playas, they gonna play / And haters, they gonna hate"—that make up the heart of the song *Playas Gon' Play*.

Though the words "players" and "haters" have been in the vernacular for some time, I note an expert's opinion that these words have been first transformed and then arranged together in its particular and distinctive way to form the catchy phrase at issue was unprecedented at the time it was authored for the song *Playas Gon' Play*. Kajikawa Report at §8; Kajikawa Ferrara Rebuttal Report at §10; Kajikawa Morgan Rebuttal Report at §7.

Moreover, the expert points out that *Shake It Off* uses nearly identical words in nearly identical ways as the basis for the chorus of each song, again the most memorable part of each song. Kajikawa Ferrara Rebuttal Report at §2. And that the use of the phrase at issue in *Shake It Off*, the expert opines, is strikingly similar to the use in *Playas Gon' Play*. Kajikawa Report at §11.

F.  **Lyricists and composers are by industry custom and practice presumed to share their joint interests in a song *equally*, even when their respective contributions are not equal.**

Contributions of lyrics and music to the creation of a song are usually intended by their authors to be merged for form a *joint work*. A "joint work" is a work prepared by two or more

---

[4] Bob Kohn, *Kohn On Music Licensing,* 5th Edition (Wolters Kluwer, 2019) [emphasis added].

authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole. 17 U.S.C. § 101. Each author of a joint work owns an undivided interest in the copyright for the work as a whole, regardless of what parts (e.g., lyrics, music) they each contributed to the work.

By custom and practice, in the absence of an agreement to the contrary, all joint authors are presumed to share **equally** in the ownership of the joint work, "even when it is clear that their respective contributions are not equal."[5] The authors may, however, agree to another division.

It is safe to say that the power of the lyrical phrase at the heart of both songs in this case overwhelm the other elements of the songs, such as the balance of the lyrics and the musical elements. This is supported by the fact that Ms. Swift and her co-writers discarded nearly all but the Plaintiffs' distinctive phrase and used it repeatedly in her version. Without the heart of the lyrics taken from *Playas Gon' Play*, the rest of the lyrics in *Shake It Off* lose all of its force, meaning, and energy.

Therefore, in considering what portion of the profits of *Shake It Off* are attributable to *Playas Gon' Play*, I would weigh Plaintiff's copyrighted phrase quite heavily in this case. Indeed, the distinctive phrase would seem to far outweigh the balance of the lyrics in either song. Evidence of the strength of Plaintiff's lyrical phrase has been presented by Defendants in showing how it has since so often been used, and used so poignantly, in pop culture.

Thus, as a preliminary matter, applying custom and practice, it would not be unfair to attribute the profits from Defendants' infringing use of the heart of the lyric of *Playas Gon' Play* as 50%. But other factors may increase or decrease this attribution.

---

[5] *See*, Nimmer §6.08[A] (citing, *Sweet Music, Inc. v. Melrose Music Corp.*, 189 F.Supp. 655 (1960) ("looking to the analogy of tenants-in-common generally, the long-settled rule is that 'if their share are not fixed in the deed or will creating the cotenancy, they take in equal shares', citing 2 American Law of Property § 6.5 (Casner ed. 1952)).

**G.     Factors that may increase or decrease the percentage attribution**

Defendants appear to be suggesting that, since variations of Plaintiff's original lyrical phrase have been used in other contexts (e.g., comedy skits and the like), that it is no longer protected by its copyright when used in other songs. But that is like saying phrases such as Dylan's "the answer my friend is blowin' in the wind," the Rolling Stone's "I can't get no satisfaction," or Elton John's "lived her life like a candle in the wind," could be infringed by another song with impunity, simply because each of those phrases have since been commonly used in other media.

It may also be useful to ask how much of the profits are attributed to the infringed lyric and how much to the personal selling power of Ms. Swift? Certainly, Ms. Swift has selling power, but what mitigates the importance of that power at the time *Shake It Off* was published is this: the success of *Shake It Off* was pivotal in transforming Ms. Swift's commercial rise from a country music performer to a mainstream pop celebrity. Kajikawa Report at §22.

Accordingly, while an argument for decreasing the profit attribution by virtue of Ms. Swift's popularity as a country star, that decrease appears to be entirely overwhelmed by the importance of the infringing use had in greatly enhancing Ms. Swift's attraction to a much wider audience. This is evidenced by the fact that *Shake It Off* became a pop hit single on her album entitled *1989*. Id. Thus, the importance of Ms. Swift's celebrity in relation to the use of the lyrics appears, at best, cancelled out by how much her infringement of the lyric significantly advanced her career.

As noted, in the absence of an agreement to the contrary, authors of a joint work such as a song are presumed to share equally in the ownership of the song. The authors may, however, agree to another division. For example, a lyricist with great star power or bargaining leverage could insist upon receiving a full 50% interest in compositions he or she co-wrote, even when two composers

contributed to the writing the musical elements of the song, each of whom would share the remaining 50% equally, rather than two-thirds interest equally.

Thus, conceivably, Taylor Swift, if she had the star power at the time, might have demanded a full 50% for her contribution to the song *Shake It Off*, leaving the other 50% to be shared by her two co-composers. This would suggest that she would be entitled to a higher attribution of the profits from *Shake It Off*, because of her star power or bargaining leverage.

But at the time the song was published, the songwriter interests in the song appeared to have been shared *equally* among the three songwriters with Ms. Swift only taking a 1/3 interest, not a 50% interest. Evidently, Ms. Swift either did not have the star power or negotiating leverage to obtain more than 1/3 interest in the song, or she declined to use that leverage.

This suggests that had Ms. Swift actually co-written *Shake It Off* with the Plaintiffs, she would not have likely received more than an equal share (i.e., a 1/3 interest in the song) with her two co-writers. She either wouldn't have had the leverage to demand a greater percentage, or she would have chosen not to use that leverage. Most likely, she might have accepted, as she did with *Shake It Off*, a 1/3 share, leaving Plaintiffs collectively with a 2/3 share of the copyright. Under these circumstances, the 1/2 (50%) share of the profits from *Shake It Off* attributable to *Playas Gon' Play* could be considered low, or at least should certainly not be subject to reduction for this reason.

Conceivably, if Ms. Swift, as the lyric writer, only received a 1/3 interest, one might suggest that the music was twice as important as the lyrics. But this would be unpersuasive. First, her Copyright Registration for *Shake It Off* lists all three songwriters as having created both music and lyrics. D-000668. Second, even if her contribution mostly comprised the lyrics, the three-way split would have little bearing upon the relative importance of the lyrics she added to create *Shake*

*It Off*. As noted, it is custom and practice to split shares equally among writers unless another division is agreed upon. The relative importance of the music and lyrics to the success of the song are typically dependent entirely upon factors that have nothing to do with how ownership is split.

In this case, those other factors heavily weigh toward the overriding importance of distinctive phrase of *Playas Gon' Play*, evidenced, in part, by the impact that powerful phrase subsequently had on popular culture—as amply shown by Defendants' submissions (e.g., comedy skits, etc.).

**H.      Profits from *Shake It Off* attributable to *Playas Gon' Play* may fairly be set at 50%**

The portion of the profits from *Shake It Off* attributable to infringement of the *Playas Gon' Play*, in my view, may reasonably be set by the Court at 50%. As Judge Hand observed, this does not give the plaintiffs "everything," but "the defendants must be content to accept much of the embarrassment resulting from mingling plaintiffs' property with their own." [6]

### V. PUBLICATIONS AUTHORED WITHIN THE PRECEDING 10 YEARS

The following is a list of all publications authored by me within the preceding 10 years:

- "How Book Publishers Can Beat Amazon," *New York Times* (May 30, 2014).
- *Kohn On Music Licensing*, 5th Edition (Aspen Law & Business 2019).
- *How Build a Friendly Robot: A Philosophical Novel* (Theoria Books, 2019).

---

[6] *Sheldon v. Metro-Goldwyn-Mayer Pictures Corp.*, 106 F.2d 45, 51 (1939). More recently, courts have echoed Judge Hand's lament: "this is not an area susceptible to precise measurement." *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*. 508 F.Supp. 798, 801 (S.D.N.Y. 1981), modified, 722 F.2d 988 (2d Cir. 1983); *Gaste v. Kaiserman*, 863 F.2d 1061, 1069 (2d Cir. 1988).

## VI. DATA OR OTHER INFORMATION CONSIDERED IN FORMING THESE OPINIONS

The data or other information I considered in forming these opinions include:

- Complaint, Answer, Motion for Summary Judgment papers, including exhibits thereto.
- Expert materials, including reports and rebuttal reports of Plaintiff experts Kajikawa and Saitz, and of Defendents' experts Ferrara, Morgan, and Lewis.
- Recordings of the song at issue.
- Plaintiffs document production and Defendants' document production.

to such pleadings.

## VII. EXPERT WITNESS FEE

My fees for services rendered as an expert witness in this case is $650.00 per hour.

## VIII. RECENT TESTIMONY AS AN EXPERT WITNESS

2007  *United States v. ASCAP in the Matter of America Online, Inc., RealNetworks, Inc., and Yahoo!, Inc.,* 559 F.Supp.23d 332 (2008). Testified on behalf of ASCAP regarding how musical works and sound recordings are used on the Internet, including their use on services such as AOL, RealNetworks, and Yahoo!

2009  *Zappa v. Rykodisc,* Case No. 08-cv-00396) (S.D.N.Y). Provided an expert witness report on behalf of a record label owned by Warner Music Group regarding music industry customs and practices concerning the sale of sound recordings by the artist Frank Zappa.

2015  *Fahmy v. Jay-Z (aka, Shawn Carter), et. al.*, Case No. 2:07-cv-05715-CAS (April 28, 2015 C.D. Cal.   Provided on behalf of the recording artist known as Jay-Z an expert

witness report and testified on the language and purpose of several international music license agreements in light of music industry practices.

2017   *Marcus Gray v. Katy Perry,* Case No. 2:15-cv-05642-CAS-JC (April 3, 2017, C.D. Cal.). Provided on behalf of recording artist Katy Perry, a federal court with an expert witness declaration on music industry customs and practices concerning the scope of live concert public performance licenses granted by ASCAP.

2018   *Curtis James Jackson, III (p/k/a/ "50 CENT") v. William Leonard Roberts, II (p/k/a/ RICK ROSS)*, Case No. 3:17-cv-00550-WWE. (D. Conn.). Provided on behalf of hip-hop recording artist "Rick Ross" an expert report and testified on the interpretation of the terms of an exclusive recording agreement between Universal Music Group and the recording artist known as "50 Cent," as well as industry practices concerning the use of the name, voice and likeness of a recording artist in connection with the marketing and distribution of sound recordings of other recording artists.

2019   *BMG Rights Management (US) LLC v. Global Eagle Entertainment, Inc.*, Case No. 2:18-cv-03723. Provided, on behalf of music publisher BMG Rights Management, the U.S. District Court for the Central District of California an expert report on music industry customs and practices with respect to the use of music on commercial airline flights.

2019   *Bob Gaudio, et. al. v. Spotify USA Inc.,* (Case No. 3:17-cv-01052) Provided, on behalf of several music publishers, including the publisher of the music performed by the "Four Seasons," the U.S. District Court for the Middle District of Tennessee, Nashville Division an expert report, declarations, and testimony concerning the customs and practices regarding the licensing of musical works for interactive subscription and non-subscription streaming services of digital music service providers.

2020   *Eight Mile Style, LLC v. Spotify USA, Inc.* (Case No. 3:19-cv-00736, M.D. Tennessee, Nashville Division). Engaged by a music publisher that owns copyrights of the songwriter and artist known as "Eminem" as an expert witness concerning the customs and practices regarding the licensing of musical works for interactive subscription and non-subscription streaming services of digital music service providers.

2022   *Levy v. Zimmerman*, 2022 NY Slip Op 02225. Provided a declaration concerning the interpretation of music industry terms of art in a songwriter agreement.

## X.   INTENDED TRIAL EXHIBITS AND SUPPLEMENTATION

At trial, I reserve the right to use all materials considered in preparing this report, including without limitation the materials set forth in the foregoing sections.

I understand that additional reports and depositions of experts and other witnesses may be conducted in this matter. I plan on reviewing their deposition transcripts when they become available and reserve the right to supplement or amend this report after such review.

Finally, I reserve the right to supplement or modify this report and the opinions expressed based upon additional facts, documents, or other materials that may be brought to my attention.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my ability and that this declaration was executed on the date set forth below in Shelter Island, NY.

Dated: May 27, 2022

Respectfully submitted,

*[signature]*

Bob Kohn

# BOB KOHN
46 S Ram Island Dr.
Shelter Island, NY 11964-0581
408-602-5646      bob@bobkohn.com

### EXPERIENCE

| | |
|---|---|
| 1992-date | Author, *Kohn On Music Licensing,* Wolters Kluwer (5th Ed. 2019) |
| 2014-date | ADMITTED, SECOND CIRCUIT FEDERAL COURT OF APPEALS |
| 2002-date | EXPERT WITNESS IN CUSTOMS AND PRACTICES OF MUSIC INDUSTRY |
| 2005-2014 | ROYALTYSHARE, INC., San Diego, CA<br>Founder, Chairman & CEO<br>o Provided enterprise services and technology solutions for royalty accounting to record labels, music publishers, and book publishers<br>o Clients included Sony Music Group, Hachette Book Group, Macmillan, Welk Music Group, Ministry of Sound (U.K.), and Nettwerk (Canada) |
| 2000-2005 | BORLAND SOFTWARE CORP., Cupertino, CA<br>Vice Chairman of the Board; Chairman of the Audit, Corporate Governance, and Compensation Committees |
| 1997-2001 | EMUSIC.COM, INC., Redwood City, CA<br>Chairman & Co-founder<br>o First legitimate MP3 music download service<br>o Took public in 1999 (NASDAQ:EMUS). |
| 1996 - 1997 | PRETTY GOOD PRIVACY, INC., San Mateo, CA<br>Vice President, Business Development and General Counsel<br>o PGP encryption software |
| 1987 - 1996 | BORLAND INTERNATIONAL, INC., Scotts Valley, CA<br>Senior Vice President, Corporate Affairs General Counsel, and Secretary<br>o Developer of Sidekick, Turbo Pascal, Borland C++, Quattro Pro, Paradox, and dBASE II<br>o Managed and won *Lotus v. Borland,* 516 U.S. 233 (1996) |
| 1985 – 1987 | CANDLE CORPORATION, Los Angeles, CA<br>Associate General Counsel<br>o Developer of software for mainframe computers |
| 1983 -1985 | ASHTON-TATE, Culver City, CA<br>Corporate Counsel<br>o Developer of personal computer software, including dBASE II |

Exhibit 1 - 19

| | |
|---|---|
| 1980 -1983 | RUDIN, RICHMAN & APPEL, Beverly Hills, CA<br>Associate Attorney (1982-1983)<ul><li>Entertainment industry clients, including Frank Sinatra, Liza Minnelli, Cher, Frontline Management (Irving Azoff), and Warner Bros. Music.</li></ul> |
| 1980 - 1983 | ENTERTAINMENT LAW REPORTER, Santa Monica, CA<br>Advisory Board (1983-2000); Associate Editor (1980-1983) |

**ACADEMIC BACKGROUND**

| | |
|---|---|
| 2016-2018 | VISITING SCHOLAR, COLUMBIA LAW SCHOOL, New York, NY |
| 2016 | COLUMBIA LAW SCHOOL<ul><li>LL.M degree – May 2016</li><li>James Kent Scholar (highest honors)</li></ul> |
| 1994 – 1996 | MONTEREY COLLEGE OF LAW, Monterey, CA<ul><li>Adjunct Professor of Law</li></ul> |
| 1981 | ADMITTED TO CALIFORNIA BAR, December 1981<ul><li>Member in good standing (2021)</li></ul> |
| 1978 -1981 | LOYOLA LAW SCHOOL, Los Angeles<ul><li>J.D. degree - June, 1981</li></ul> |
| 1974-1978 | CALIFORNIA STATE UNIVERSITY, NORTHRIDGE<br>B.S. Degree in Business Administration; Major: Finance; Minor: Economics |

**PERSONAL**

Author, *How To Build A Friend Robot* (Theoria Books, 2019)
- Novelization of master's thesis to educate the general public on AI ethics issues

Author, *Mind and Brain: The Genius of Fortune* (Great Ideas Today 1994)
- winner of essay contest sponsored by the Encyclopedia Britannica and judged by its Editor-In-Chief, Mortimer J. Adler.

Co-inventor, *Web-based Royalty System and User Interface*, Patent No. US 8,712825 (April 29, 2014)
- patent for a means of tracking revenues and producing royalty statements arising from the exploitation of musical works and sound recordings.

Exhibit 1 - 20