# EXHIBIT 3

## EXPERT WITNESS REBUTTAL REPORT OF BOB KOHN

### I.  EXPERT REBUTTAL ASSIGNMENT

My assignment in this rebuttal report was to assess and, to the extent necessary, respond to the expert report of Barry M. Massarsky ("Massarsky Report"), the supplemental report of Nathaniel Lewis ("Lewis Report"), and report of Jim Parham ("Parham Report"), submitted by Defendants in this case.

### II.  EXPERT REBUTTAL OPINION

**A.    The Massarsky Report**

The result of the Massarsky Report—attributing only 4% of the profits from *Shake It Off* to the infringed lyrics from *Playas Gon' Play*—suffers from three false premises:

The ***first*** concerns what the Report called the "Taylor Swift Effect"—that is, the portion of the profits of *Shake It Off* allegedly attributable to the celebrity of Taylor Swift compared with the value of the lyrics infringed from *Playas Gon' Play*. The celebrity "effect" used in that analysis did not consider how Ms. Swift's celebrity as a country music artist was propelled forward by her use of the lyrics from *Playas Gon 'Play*—rising from a country music artist to stardom in the far larger audience for pop music. Indeed, much of her new-found pop music star power appears attributable to what she took from *Playas Gon' Play*.

The ***second*** concerns what the Massarsky Report did not consider at all: the qualitative substantial value of the lyrics taken from *Playas Gon' Play*. While the report purports to assess the relative value of the lyrics taken and other factors, not once does the report consider the importance of the lyrics. Not only did they help propel Ms. Swift to pop music stardom, Ms. Swift herself found the lyrics so valuable that she even prosecuted and obtained a federal

**EXHIBIT**

**116**

Kohn
8.4.22

trademark registration for the mark, "Players Gonna Play." Indeed, she knew of the importance of the Plaintiff's lyric, even before she released *Shake It Off*—having filed her application for her "Players Gonna Play" mark with the U.S. Patent & Trademark Office five days *prior* to the public release of *Shake It Off*.

The **third** false premise concerns the Massarsky Report's comparison between Taylor Swift's recording of *Shake It Off* and a lesser known "cover" recording of the same song by a lesser known recording artist. This eight-page analysis, representing the heart of the Massarsky Report, is a red herring, presenting a false dichotomy. The Report admits there have been at least eleven other commercially released versions of "Shake It Off," most of which were recorded by even lesser known artists. Had the Report used any one of those lessor known versions for its analysis, it would have reached an even more exaggerated Taylor Swift Effect. Should this kind of false comparison be accepted, well-known recording artists would have a great incentive to infringe the works of lesser-known artists and songwriters. Indeed, the more star power the infringer has, the more he or she would be able to plagiarize with impunity.

As Judge Hand observed, while it would be unjust to give plaintiffs everything, "the defendants must be content to accept much of the embarrassment resulting from mingling plaintiffs' property with their own." *Sheldon v. Metro-Goldwyn-Mayer Pictures Corp.*, 106 F.2d 45, 51 (1939). "We must make an award which by no possibility shall be too small." Id.

1. **In assessing the "Taylor Swift Effect," the Massarsky Report fails to consider the role Ms. Swift's use of the Plaintiff's lyrics played in propelling her career from a country music celebrity to stardom in the much larger pop music market.**

It is undisputed that, as of the time she released *Shake It Off* as part of her fifth album entitled *1989*, Ms. Swift was a country music artist and celebrity. The Massarsky Report is correct in asserting that Ms. Swift's celebrity should be considered in determining the profit attributable

to her use of Plaintiffs' lyrics. Indeed, in determining the portion of profits of George Harrison's song *My Sweet Lord* that was attributed to what was taken from *He's So Fine* (recorded years earlier by the Chiffons), District Judge Owen, attributed 25% to "the popularity and stature of George Harrison in his particular field of music."[1]

But the Massarsky Report, in concluding that 96% of the profits from *Shake It Off* are attributed to Ms. Taylor's popularity and stature, omits a material factor in considering the value of that popularity. At the time *Shake It Off* was released as part of Ms. Swift's album entitled *1989*, her "particular field of music" was *country music*. According to one of the experts testifying in this case, it was the song *Shake It Off* included in the *1989* album, which "cemented Taylor Swift's rise from Country music underdog to mainstream pop celebrity." Kajikawa Report at §22. The Court need not take an expert's word for it. This fact is so well-known, as reported repeatedly in press accounts, that no expert should need opine on it.

In the *Rolling Stone* cover story, J. Eells, "The Reinvention of Taylor Swift: She left country behind, sworn off dating and built a fortress around her heart," *Rolling Stone* (Sept. 8, 2014), the music industry's paper of record reported,

> "She has a new album out in October, [entitled] *1989*, that she's insanely excited about, because it signals her transition from a country star who likes pop to a straight-up pop star.
>
> "Swift's last album, 2012's *Red*, straddled the line between country and pop. 'But at a certain point,' [Swift] says, 'if you chase two rabbits, you lose them both.' So, this time, she set out to do full-on 'blatant pop music.'"

---

[1] *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 508 F. Supp. 798, 801 (S.D.N.Y., 1981) ("Although this is not an area susceptible to precise measurement, I conclude that three-fourths of 'My Sweet Lord's' success is due to the plagiarized tune and one-fourth to other factors, such as the words and popularity and stature of George Harrison in his particular field of music").

The country music industry trade press picked up on this pivotal moment in Ms. Swift's career. In C. Vinson, "Taylor Swift Admits Scott Borchetta Begged Her to Put Country Songs on '1989', _Taste of Country_ (Sept. 8, 2014), it was reported:

> "With the impending release of Taylor Swift's new record '1989', there has been much talk about the hitmaker's official transition from country to pop. Swift admits that she's happy with the direction she's taken…even if it means a full dive into a new genre, much to her label's dismay.

> "Swift's 2012 release 'Red' featured some songs with her well-known country sound, but the new album won't nod toward her country root at all. The reason? While Swift doesn't totally explain the full-on switch, she admits to _Rolling Stone_, "…At a certain point, if you chase two rabbits, you lose them both."

_Shake It Off_ wasn't just any song on the _1989_ album.  The song spent 50 weeks, including four weeks at number one, on the Billboard Hot 100, earned three Grammy nominations at the 2015 Grammy Awards, and was voted Favorite Song at the 2015 People's Choice Awards. The song had enough staying power to be ranked #18 on the 2015 Hot 100 year-end chart. In Billboard's 2010-2019 decade-end Hot 100 chart, the song was ranked #34.  _Shake It Off_ was certified Diamond (10x Platinum) by the RIAA. _See_, Massarsky Report at 8-9.

It is clear that, at the time she released _Shake It Off_, Ms. Swift's selling power was in one "particular field of music": _country_ music. It was _Shake It Off,_ included in her _1989_ album—with its original and urban/R&B lyrics taken from _Playas Gon' Play_—that helped "connect Swift to a 2014 pop music landscape deeply influenced by hip hop and R&B."  Kajikawa Report at §22. As a result, the success of _Shake It Off_ was pivotal in transforming Ms. Swift's commercial rise from a country music performer to a mainstream pop star.

By not considering how her use of the lyrics taken from _Playas Gon' Play_ materially broadened Ms. Swift's country music celebrity and appeal to the far larger pop audience, the

Massarsky Report grossly overestimates the amount her celebrity played in the success of *Shake It Off*. In my own expert witness report, I conceded that Ms. Swift's celebrity should be considered in attributing profits from *Shake It Off*, but that her celebrity effect in the country music field appeared, at best, cancelled out by how much her infringement of the Plaintiffs lyric significantly propelled her career into the broader pop music market. Indeed, much of her new-found pop music star power appears to be attributable to what she took from *Playas Gon' Play—i.e., "players gonna play" and "haters gonna hate*." One might call this the "Playas Gonna Play Effect." By not taking this countervailing factor into account, the Massarsky Report substantially over-assesses how much the profits from *Shake It Off* are attributable to what he calls the "Taylor Swift Effect."

### 2. The Massarsky Report fails to consider the qualitative substantiality of the infringed lyric.

The Massarsky Report never recognizes either the importance of how Plaintiffs' lyrics helped connect Ms. Swift to the whole new and larger pop music landscape or the importance that Ms. Swift herself attached to Plaintiffs' lyrics prior to the release of *Shake It Off*. As noted, the lyrics "players gonna play" and "haters gonna hate" helped to connect Ms. Swift to a 2014 pop music landscape deeply influenced by hip hop and R&B. Kajikawa Report at §22. Indeed, the value of that lyric to Ms. Swift was so pivotal to her career that she had one of her companies obtain a trademark registration for the mark "Players Gonna Play" from the U.S. Patent & Trademark Office. See, Exhibit A, attached hereto, a public record of such mark accessed from the website of the U.S. Patent & Trademark Office.

And it is not as though Ms. Swift appreciated the importance of "Players Gonna Play" *after* the song *Shake It Off* became a huge commercial success. She clearly appreciated the importance of the lyric even *before* the release of *Shake It Off*. According to records of the U.S. Patent & Trademark Office, Ms. Swift filed her trademark application on August 14, 2014, five days *before*

the release of *Shake It Off* on August 19, 2014. Indeed, during the August, 2014 timeframe, Ms. Swift filed trademark applications for only four marks: "1989," T.S. 1989," "Shake It Off," and "Players Gonna Play." Under these circumstances, the importance of the phrase "Players Gonna Play" to the song *Shake It Off*, Taylor Swift's career, and her merchandising business is unmistakable.

In the *My Sweet Lord* case, the court recognized "this is not an area susceptible to precise measurement." Indeed, no amount of economic analysis can surmise what a celebrity's value is to a song and what a song's value is to forming celebrity status. But, under these facts, in attributing only 4% to what Ms. Swift now has an enforceable trademark, the Massarsky Report not only overvalues her celebrity effect, it materially under-appreciates the importance of Plaintiff's lyric to *Shake It Off* and to Taylor Swift herself, even before she released the song.

> ### 3. The Massarsky Report's comparison of Taylor Swift's recording of *Shake It Off* and a lesser known "cover" recording of the same song by a lesser-known recording artist is unsound.

The third false premise concerns the Massarsky Report's comparison between Taylor Swift's recording of *Shake It Off* and a lesser known "cover" recording of the same song by a lesser-known recording artist named Ryan Adams. The Massarsky Report admits there have been at least eleven other commercially released versions of *Shake It Off*, most of which were recorded by artists even lesser-known than Ryan Adams. Had the Report used any one of those lesser-known versions for its analysis, it would have reached an even more exaggerated "Taylor Swift Effect."

Had the pop star Katie Perry produced a "cover" recording of *Shake It Off*, would the Massarsky Report's calculation of the "Taylor Swift Effect" have been significantly less? Had Ryan Adams recorded the Lennon/McCartney song *Yesterday* and Mr. Adam's version was not a

commercial success, could this information be used to help conclude that the success of *Yesterday* was attributed 96% to the Beatles star power and only 4% to the song itself?

It should be clear that merely comparing Taylor Swift's version of the song to another artist's version presents a false dichotomy, which does not take into account the importance what was taken from *Playas Gon' Play* relative to the success of *Shake It Off*.

Should this kind of false comparison be accepted, well-known recording artists would have a great incentive to infringe the works of lesser-known artists and songwriters. Indeed, the more star power the infringer has, the more he or she would be able to plagiarize with impunity. The conclusion of the Massarsky Report, which appears to hang fully on this false comparison, should be rejected for this reason alone.

**B.    The Lewis Report**

The Lewis report contends, without supporting evidence, that the success of the lyrics of songs, like the success of any poem, is rarely limited to a few words or lines. But there are numerous examples of successful poems and lyrics, the heart of which are comprised of just a few words or lines—from Walt Whitman's "Oh Captain! My Captain!" to Irving Berlin's "White Christmas," every stanza of which begins, "I'm dreaming of a White Christmas." Even songs with one-word or two-word lyrics have achieved enormous commercial success, such as *Tequila* recorded by The Champs and *Wipe Out* recorded by The Surfaris.

The brevity of an original phrase taken has little bearing on what rises to a level of infringement and in attributing profits from its infringing use. While words like "player" and "hater" may be frequently used by songwriters, it is the few distinctive word-phrases—modified creatively (e.g., "players" to *playas*, "going to" to *gonna*) in the particular and unique arrangement created by Plaintiffs that make up the heart of the song *Playas Gon' Play*.

7

Exhibit 3 - 78

Moreover, the Lewis Report contends that "the poetic power and pleasure of the lines in *Shake It Off* do not lie in the three-word phrases themselves" and concludes that the compelling poetic effect of *Shake It Off* is "the result of numerous devices and formal strategies that go well beyond the contested three-word phrases." Yet, he does explain why Ms. Taylor chose one of those three-word phrases—*Players Gonna Play*—to register as her exclusive trademark.

## C.    The Parham Report

It is undisputed that Taylor Swift's celebrity had some effect upon the profits from *Shake It Off*. The questions at hand are: What is the extent of that effect? What effect did the use of Plaintiffs' lyrics have on Ms. Swift's celebrity at the pivotal moment of her career?  The Parham Report addresses neither of those questions.

## III.  RECENT TESTIMONY AS AN EXPERT WITNESS

In my Expert Witness Report dated May 27, 2022, I inadvertently did not include the following five cases in which I testified as a witness during the last five years:

2016    *Tresona Multimedia, LLC v. Burbank High School Vocal Music Association, et. al.*, Civil Action No. 2:16-CV-04781-SVW (U.S. District Court, Arizona). Testified on behalf of a music publishing representative to describe business customs and practices relating to the preparation of custom arrangements of copyrighted musical works, the reproduction of such arrangements to facilitate public performances, and the distribution of copies embodying them and the types of licenses required from the holder of the relevant rights in the underlying musical works by means, including what is customarily called a "custom arrangement license."

2016    *Beckett et. al. v. Universal International Music B.V.*, Case No. CV 15-02153 SJOI (JCx). Submitted an expert witness report on behalf of Defendant Universal International Music to describe several concepts relating to the customs and practices of the recorded music industry,

including certain basic tenets of typical artist recording agreements, including the ownership of recordings by the record company, the concept of recoupment of advances from royalties and why it exists, the difference between record royalties and licensing royalties, including what explains the disparity of rates between the two, and the role an attorney can play in the negotiation of a record contract, including the limitations on that role.

2018    *Twelve Sixty LLC et. al. . v. Extreme Music Library Limited*, Case No. 1:17-CV-01479-PAC (S.D.N.Y.). Testified on behalf of a music publisher and two songwriters to supplement the record with an interpretation of the meaning of several key terms of a composer agreement and its amendment underlying the action against a production music library alleged to have failed to allocate royalties properly under the terms of such agreements, including allegations that the CEO of the production music library contributed his own compositions to the library under a variety of pseudonyms.

2020    *Four Jays Music Company et. al.  v.  Apple, Inc. et al.*, Case No. 2:19-cv-7952-FMO-MAA. (C.D. Cal.). Testified on behalf of plaintiff music publishing company controlling the interests in the musical works composed by American songbook composer Harry Warren to describe the kinds of online music distribution and services provided by defendant Google and how those services result in digital music being made available to users around the world and, specifically, those located in the Los Angeles area.

2021    *SA Music, LLC et al. v. Apple Inc. et. al.*, Case No. 20-cv-2146-JSC (N.D. CA.) Testified on behalf of plaintiff music publishing company controlling the interests in the musical works composed by American songbook composer Harold Arlen to describe the kinds of online music distribution and services provided by defendant Apple.

## IV. Intended Trial Exhibits and Supplementation

At trial, I reserve the right to use all materials considered in preparing this report, including without limitation the materials set forth in the foregoing sections.

I understand that additional reports and depositions of experts and other witnesses may be conducted in this matter. I plan on reviewing their deposition transcripts when they become available and reserve the right to supplement or amend this report after such review.

Finally, I reserve the right to supplement or modify this report and the opinions expressed based upon additional facts, documents, or other materials that may be brought to my attention.

I declare under penalty of perjury of the laws of the United States that the foregoing is true
and correct to the best of my ability and that this declaration was executed on the date set forth
below in New York, NY.

Dated: July 6, 2022

Respectfully submitted,

Bob Kohn

Exhibit 3 - 82

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | BOTTOM | HELP

**Logout** Please logout when you are done to release system resources allocated fo

## Record 1 out of 1

TSDR | ASSIGN Status | TTAB Status *( Use the "Back" button of the Internet Browser to r to TESS)*

## PLAYERS GONNA PLAY

| | |
|---|---|
| **Word Mark** | **PLAYERS GONNA PLAY** |
| **Goods and Services** | IC 016. US **002 005 022 023 029 037 038 050**. G & S: Stationery; stickers; blank jour notebooks. FIRST USE: 20161211. FIRST USE IN COMMERCE: 20161211 |
| | IC 025. US 022 039. G & S: Clothing, namely, bandanas, shirts, t-shirts, tops for child adults, headwear. FIRST USE: 20161124. FIRST USE IN COMMERCE: 20161124 |
| **Standard Characters Claimed** | |
| **Mark Drawing Code** | (4) STANDARD CHARACTER MARK |
| **Serial Number** | 86363134 |
| **Filing Date** | August 11, 2014 |
| **Current Basis** | 1A |
| **Original Filing Basis** | 1B |
| **Published for Opposition** | July 21, 2015 |
| **Registration Number** | 5186873 |
| **Registration Date** | April 18, 2017 |
| **Owner** | (REGISTRANT) TAS RIGHTS MANAGEMENT, LLC LIMITED LIABILITY COMPANY TENNESSEE 718 THOMPSON LANE SUITE 108256 NASHVILLE TENNESSEE 372 |
| **Assignment Recorded** | ASSIGNMENT RECORDED |
| **Attorney of Record** | Natalya L. Rose |
| **Type of Mark** | TRADEMARK |
| **Register** | PRINCIPAL |
| **Live/Dead Indicator** | LIVE |

TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | TOP | HELP

Exhibit 3 - 83